# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

### No. 22-5069

JAMES BLASSINGAME AND SIDNEY HEMBY

Appellees,

v.

DONALD J. TRUMP

Appellant,

### No. 22-7030

REPRESENTATIVE ERIC SWALWELL

Appellees,

v.

DONALD J. TRUMP, et al

Appellant,

### No. 22-7031

HON. BENNIE G. THOMPSON, et al.

Appellees,

v.

DONALD J. TRUMP, et al.

Appellant.

### BRIEF OF APPELLEES

Joseph M. Sellers, D.C. Cir. Bar No.
30022
Brian Corman, Bar No. DC1008635
Alison S. Deich, Bar No. DC1572878
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Avenue, N.W. Fifth
Floor Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
jsellers@cohenmilstein.com
bcorman@cohenmilstein.com
adeich@cohenmilstein.com

Janette McCarthy-Wallace Bar No.
OH066257
Anthony P. Ashton, Bar No. MD25220
Anna Kathryn Barnes, Bar No. 63609
NAACP
Office of General Counsel
4805 Mount Hope Drive
Baltimore, MD 21215
Telephone: (410) 580-5777
jlouard@naacpnet.org
aashton@naacpnet.org
abarnes@naacpnet.org

Robert B. McDuff
MISSISSIPPI CENTER FOR
JUSTICE
767 North Congress Street
Jackson, MS 39202
601-259-8484

*Attorneys for Appellees Bass
Plaintiffs**

Philip Andonian (Bar No. 63669)
Joseph Caleb (D.C. Bar No. 495383)
CALEBANDONIAN PLLC
1100 H Street, N.W., Ste. 315
Washington, D.C. 20005
Tel: (202) 953-9850
phil@calebandonian.com
joe@calebandonian.com

Matthew Kaiser (Bar No. 5303)
Sarah R. Fink (Bar No. 63849)
KAISERDILLON PLLC
1099 Fourteenth Street, N.W., 8th
Fl.West
Washington, D.C. 20005
Tel: (202) 640-2850
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com

*Attorneys for Appellee Eric Swalwell*

Patrick A. Malone (Bar No. 397142)
Daniel Scialpi (Bar No. 997556)
Heather J. Kelly (Bar No. 453154)

Cameron Kistler (Bar No. 62145)
Erica Newland (Bar No. pending)
Kristy Parker (Bar No. 63922)
Jacek Pruski

PATRICK MALONE &
ASSOCIATES, P.C.
1310 L Street, N.W., Suite 800
Washington, D.C. 20005
P: 202-742-1500
F: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com
hkelly@patrickmalonelaw.com

Anne Tindall
Helen E. White (Bar No. pending)
UNITED TO PROTECT
DEMOCRACY
2020 Pennsylvania Ave. NW, #163
Washington, D.C. 20006
P: 202-579-4582
cameron.kistler@protectdemocracy.org
erica.newland@protectdemocracy.org
kristy.parker@protectdemocracy.org
jacek.pruski@protectdemocracy.org
anne.tindall@protectdemocracy.org
helen.white@protectdemocracy.org

John Paredes
UNITED TO PROTECT
DEMOCRACY
115 Broadway, 5th Floor
New York, N.Y. 10006
P: 202-579-4582
john.paredes@protectdemocracy.org

Genevieve C. Nadeau (Bar No. 63685)
Benjamin L. Berwick (Bar No. 62300)
UNITED TO PROTECT
DEMOCRACY
15 Main St., Suite 312
Watertown, MA 02472
P: 202-579-4582
genevieve.nadeau@protectdemocracy.
org
benjamin.berwick@protectdemocracy.
org

*Attorneys for Appellees James
Blassingame and Sidney Hemby*

*After Congressman Thompson withdrew from this action, the district court referred to the remaining Plaintiffs as the "Bass Plaintiffs."  JA 214-15.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

**Plaintiffs-Appellees**

Plaintiffs-Appellees in these consolidated cases are: James Blassingame (22-5069); Sidney Hemby (22-5069); Hon. Karen R. Bass (22-7031); Hon. Stephen I. Cohen (22-7031); Hon. Veronica Escobar (22-7031); Hon. Pramila Jayapal (22-7031); Hon. Henry C. Johnson, Jr. (22-7031); Hon. Marcia C. Kaptur (22-7031); Hon. Barbara J. Lee (22-7031); Hon. Jerrold Nadler (22-7031); Hon. Maxine Waters (22-7031); Hon. Bonnie M. Watson Coleman (22-7031); and Hon. Eric Swalwell (22-7030).  Hon. Bennie G. Thompson (22-7031) was a plaintiff in the district court, but he voluntarily dismissed his claim with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) when he was appointed to be Chair of the Select Committee to Investigate the January 6th Attack on the United States Capitol.  *See* Notice of Voluntary Dismissal With Prejudice Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i) Solely As to Plaintiff Bennie G. Thompson, ECF No. 39, *Thompson, et al. v. Trump et, al.*, Case No. 1:21-cv-400-APM (D.D.C.).  All Plaintiffs-Appellants are individuals and are not required to file corporate disclosure statements under Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1.

Current attorneys for Plaintiffs-Appellees in *Thompson et al. v. Trump*, Case No. 1:21-cv-400-APM and Case No. 22-7031, are: Joseph M. Sellers; Brian Corman; Alison S. Deich; Janette McCarthy-Wallace; Anthony P. Ashton; Anna Kathryn Barnes; and Robert B. McDuff.  Current attorneys for Plaintiffs-Appellees in *Blassingame et al. v. Trump*, Case No. 1:21-cv-858-APM and Case No. 22-5069, are: Patrick Malone; Heather J. Kelly; Daniel Scialpi; Ben Berwick; Cameron O. Kistler; Genevieve C. Nadeau; Erica Newland; John Paredes; Kristy L. Parker; Jacek Pruski; Anne Tindall; and Helen E. White.  Current attorneys for Plaintiffs-Appellees in *Swalwell v. Trump*, Case No. 1:21-cv-586-APM and Case No. 22-7030, are: Philip Andonian; Joseph Caleb; Matthew Kaiser; Sarah R. Fink and William Bullock Pittard IV.  Withdrawn attorney for Plaintiffs-Appellees in *Swalwell v. Trump* is Barry Coburn.

**Defendant-Appellant:**

Defendant-Appellant in these consolidated cases is Donald J. Trump. Additional named defendants in the district court were: Donald Trump, Jr. (1:21-cv-586); Enrique Tarrio (1:21-cv-400); Hon. Mo Brooks (1:21-cv-586); Oath Keepers (1:21-cv-400); Proud Boys International (1:21-cv-400); Rudolph Giuliani (1:21-cv-400, 1:21-cv-586); and Warboys LLC (1:21-cv-400)

Current attorneys for Defendant-Appellant Donald J. Trump are Jesse R. Binnall and Molly C. McCann.

In the trial court, the following attorneys appeared for Defendants who are not parties to this appeal: Jesse R. Binnall for Donald Trump, Jr. (1:21-cv-586); John Daniel Hull, IV for Enrique Tarrio (1:21-cv-400); Jonathon Alden Moseley (withdrawn) and Kerry Lee Morgan (withdrawn) for Oath Keepers (1:21-cv-400); Joseph D. Sibley for Rudolph Giuliani (1:21-cv-400, 1:21-cv-586).

**Non-Party Respondents:**

In the trial court, the following Non-Party Respondents appeared: Office of General Counsel for the U.S. House of Representatives (1:21-cv-586) and United States of America (1:21-cv-586).  The attorneys for non-party respondents were: Douglas N. Letter for the Office of General Counsel for the U.S. House of Representatives (1:21-cv-586); Brian M. Boynton for the United States of America (1:21-cv-586); and Taheerah Kalimah El-Amin for the United States of America (1:21-cv-586).

**Amici:**

The following parties have appeared before the district court as *amici*: Evan H. Caminker, Andrew Kent, Sheldon Nahmod, Daphna Renan, and Peter M. Shane (1:21-cv-00400; 1:21-cv-00586; 1:21-cv-00858); Floyd Abrams, Erwin Chemerinsky, Martha Minow, and Laurence H. Tribe (1:21-cv-00400; 1:21-cv-00586; 1:21-cv-00858); Campaign Legal Center Action (1:21-cv-00400; 1:21-cv-

00586; 1:21-cv-00858); and Jared Holt (1:21-cv-00400; 1:21-cv-00586; 1:21-cv-00858). No *amici* have yet appeared before this Court.

Attorneys for *amici* Evan H. Caminker, Andrew Kent, Sheldon Nahmod, Daphna Renan, and Peter M. Shane are: Elizabeth B. Wydra, Brianne J. Gorod, and Dayna J. Zolle. Attorneys for *amici* Floyd Abrams, Erwin Chemerinsky, Martha Minow, and Laurence H. Tribe are: Steven A. Hirsch, Nic Marais, and Matan Schacham. Attorneys for *amicus* Campaign Legal Center Action are: Adav Noti; Jonathan M. Diaz; Mark P. Gaber; Paul March Smith; and Hayden Johnson. The attorney for *amicus* Jared Holt is Jonathan Lentine Williams.

## B.   Ruling Under Review

Defendant-Appellant seeks review of the Memorandum Opinion and Order entered on February 18, 2022, by the Honorable District Court Judge Amit P. Mehta denying Defendant-Appellant's Motion to Dismiss. *Thompson v. Trump*, ___ F. Supp. 3d ___, 2022 WL 503384 (D.D.C. 2022).

## C.   Related Cases

The Court has consolidated the related appeals No. 22-5069, 22-7030, and 22-7031. In addition to these three cases, there are four other cases involving substantially similar parties and the same or similar issues in the district courts, three of which are currently on appeal before this court:

- *Smith et al. v. Trump et al.*, Case No. 1:21-cv-2265-APM (D.D.C.)

iv

- *Moore v. Trump*, Case No. 1:22-cv-10-APM; *Moore v. Trump*, No. 22-7120

- *Kirkland v. Trump*, Case No. 1:22-cv-34-APM; *Kirkland v. Trump*, No. 22-7122 (consolidated No. 22-7120)

- *Tabron v. Trump*, Case No. 1:22-cv-11-APM; *Tabron v. Trump*, No. 22-7121 (consolidated No. 22-7120)

Plaintiffs-Appellees are not aware of any other related case pending before this Court or any other court.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellees believe oral argument is warranted in this matter.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

STATEMENT REGARDING ORAL ARGUMENT ............................................ vi

ISSUE PRESENTED ON APPEAL ..................................................................... 1

INTRODUCTION ............................................................................................... 1

STATEMENT OF THE CASE ............................................................................ 3

I.    Factual History ......................................................................................... 3
      A.    Trump Sowed Doubt in the Integrity of the Election Before
            Votes Were Cast ............................................................................ 4
      B.    Trump Tried Unsuccessfully to Overturn the Election Results
            Throughout November and December ......................................... 4
      C.    Trump and His Campaign, in Concert with Violent Extremist
            Groups, Planned a Campaign Rally for January 6, 2021 .................. 6
      D.    Trump Inflamed the Crowd and Directed It to March to the
            Capitol with Him While Congress Was Inside Counting the
            Electoral Votes ............................................................................. 8

II.   Procedural History ................................................................................. 12
      A.    *Thompson v. Trump* ..................................................................... 13
      B.    *Swalwell v. Trump* ..................................................................... 13
      C.    *Blassingame v. Trump* ............................................................... 14
      D.    The District Court's Order and this Appeal ......................................... 14

SUMMARY OF THE ARGUMENT .................................................................. 17

LEGAL STANDARD ....................................................................................... 21

ARGUMENT ..................................................................................................... 21

I.    The Scope of Presidential Immunity Is Defined by the Separation of
      Powers and the Structure of the Presidency, Both of Which Preclude
      Immunity Here ........................................................................................ 23
      A.    Courts Must Look to Constitutional Text and Structure, Along
            with Presidential Immunity's Justifying Purposes, When
            Determining Whether Specific Acts Are Immune ............................... 23

# TABLE OF CONTENTS

Page

B.   Neither the Constitution's Text or Structure, Nor the Justifying
Purposes of Presidential Immunity, Requires Immunity Here ..........25
1.   Trump Interfered with the Constitutional Process for
Counting the Electoral Votes ....................................................25
2.   Trump Obstructed Congress's Performance of Its Own
Constitutional Duties ................................................................28
3.   Trump's Conduct on January 6 Falls Outside the
Constitutional Structure of the Presidency Because it
Threatened the Very Electoral Accountability That Gives
the Office its Powers ................................................................31

II.   Trump's Claims of Presidential Power Are Dangerously Overbroad
and Do Not Entitle Him to Immunity ...........................................34
A.   Trump Was Not Taking Care that the Laws Be Faithfully
Executed ...................................................................................35
B.   Trump's Actions Cannot Be Immunized on the Ground that He
Was Speaking as President on a Matter of Public Concern ...............38
1.   Trump's First Amendment Test is Untethered from the
Constitutional Inquiry that Clinton and Nixon Require ..........38
2.   Trump's "Speech on Matters of Public Concern" Test
Would Create Boundless Presidential Immunity.....................40
C.   Trump's Remaining Arguments All Fail ...........................................43
1.   The District Court Acted Properly When It Considered
Facts Relating to Trump's Conduct .........................................43
2.   The District Court Did Not Improperly Consider Trump's
Motives in Denying his Immunity Claims................................45
3.   Trump Wrongly Conflates Westfall Act Immunity with
Presidential Immunity ..............................................................47

III.   Prudential Considerations Counsel Against Granting Trump Immunity......50

CONCLUSION ....................................................................................52

# TABLE OF AUTHORITIES

## CASES

*In re Aiken Cnty.*,
645 F.3d 428 (D.C. Cir. 2011)..........................................................32

*Anderson v. City of Inkster*,
2014 WL 3747545 (Mich Ct. App. July 29, 2014)............................33

*Banneker Ventures v. Graham*,
798 F.3d 1119 (D.C. Cir. 2015)........................................................24

*Bowsher v. Synar*,
478 U.S. 714 (1986)..........................................................................37

*Buckley v. Valeo*,
424 U.S. 1 (1976).......................................................................29, 37

*Burns v. Reed*,
500 U.S. 478 (1991)..........................................................................21

*Clinton v. City of N.Y.*,
524 U.S. 417 (1998)....................................................................26, 37

*Clinton v. Jones*,
520 U.S. 681 (1997)..2, 16, 17, 20, 21, 22, 23, 24, 28, 29, 30, 37, 38, 39, 40, 41, 43, 44, 45

*Collins v. Yellen*,
141 S. Ct. 1761 (2021)......................................................................29

*Common Cause v. Bolger*,
574 F. Supp. 672 (D.D.C. 1982), aff'd, 461 U.S. 911(1983)............33

*Council on Am. Islamic Rels. v. Ballenger*,
444 F.3d 659 (D.C. Cir. 2006)....................................................48, 49

*Davis. v. Fed. Election Comm'n*,
554 U.S. 724 (2008)..........................................................................32

## TABLE OF AUTHORITIES

*Ennis v. Crenca*,
322 Md. 285, 587 A.2d 485 (1991) ...................................................33

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010)..........................................................................19, 32

*Gallant v. N.L.R.B.*,
26 F.3d 168 (D.C. Cir. 1994) ...........................................................33

*In re Grand Jury Subpoenas*,
571 F.3d 1200 (D.C. Cir. 2009) ........................................................30

*In re Grand Jury Subpoenas*,
571 F.3d at1207 ................................................................................43

*Gravel v. United States*,
408 U.S. 606 (1972)..........................................................................30

*Gundy v. U.S.*,
139 S. Ct. 2116 (2019).......................................................................37

*I.N.S. v. Chadha*,
462 U.S. 919 (1983)..........................................................................37

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps. Council 31*,
138 S. Ct. 2448 (2018).......................................................................39

*Kilbourn v. Thompson*,
103 U.S. 168 (1880)..........................................................................37

*Korematsu v. United States*,
323 U.S. 214 (1944)..........................................................................35

*Loving v. United States*,
517 U.S. 748 (1996)..........................................................................37

*Mehau v. Reed*,
76 Haw. 101, 869 P.2d 1320 (1994) ...................................................33

*Miller v. French*,
530 U.S. 327 (2000)..........................................................................37

# TABLE OF AUTHORITIES

*Myers v. United States*,
    272 U.S. 52 (1926)........................................................................32

*New York v. United States*,
    505 U.S. 144 (1992)......................................................................37

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982).. 1, 17, 18, 20, 21, 22, 23, 24, 28, 31, 38, 39, 40, 43, 44, 45, 46, 48, 49, 51, 52

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014).............................................................18, 29, 30

*Patchak v. Zinke*,
    138 S. Ct. 897 (2018)....................................................................37

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., IL*,
    391 U.S. 563 (1968)......................................................................39

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    140 S. Ct. 2183 (2020)......................................................2, 19, 31, 32

*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022).10, 13, 14, 21

*United States v. Brown*,
    381 U.S. 437 (1965)......................................................................29

*United States v. Helstoski*,
    442 U.S. 477 (1979)......................................................................31

*United States v. Munchel*,
    991 F.3d 1273 (D.C. Cir. 2021).......................................................22

*Wilson v Libby*,
    535 F.3d 697 (D.C. Cir. 2008)........................................................49

*Wuterich v. Murtha*,
    562 F.3d 375 (D.C. Cir. 2009)........................................................49

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)......................................................................29

# TABLE OF AUTHORITIES

**STATUTES**

3 U.S.C. §§ 1-18 ...................................................................36

28 U.S.C. § 2679(d)(1) ........................................................14

42 U.S.C. § 1985(1) .................................................13, 14, 16

42 U.S.C. § 1986 .........................................................13, 17

Electoral Count Act, Pub. L. No. 49-90, 24 Stat. 373 (1887) .................35

Westfall Act, 28 U.S.C. § 2679 .........................................13, 47, 48, 49

**OTHER AUTHORITIES**

167 Cong. Rec. S731-32 .....................................................51

U.S. Const. art. I ...........................................19, 23, 25, 27, 30

U.S. Const. art. II .......................................19, 23, 25, 26, 27, 35

U.S. Const. amend. XII ......................................................25

U.S. Const. amend. XIV ......................................................22

The Federalist No. 51 (James Madison) .................................19, 27

The Federalist No. 68 (Alexander Hamilton) ...................2, 18, 26, 27, 28

The Federalist No. 69 (Alexander Hamilton) ...............................27

The Federalist No. 76 (Alexander Hamilton) ...............................27

*Payment of Expenses Associated with Travel by the President and Vice President*,
   6 Op. O.L.C. 214 (1982) ...........................................32, 34

Restatement (Second) of Judgments § 28 (1982) ...........................50

Restatement (Second) of Agency § 228 (1958) .............................49

Restatement (Second) of Agency § 228(1)(c) ..............................49

## TABLE OF AUTHORITIES

Ryan Goodman and Josh Asabor, *In Their Own Words: The 43 Republicans'
Explanations of their Votes Not to Convict Trump in Impeachment Trial*,
Just Security (Feb. 15, 2021), https://www.justsecurity.org/74725/in-
their-own-words-the-43-republicans-explanations-of-their-votes-not-to-
convict-trump-in-impeachment-trial.................................................................51

## ISSUE PRESENTED ON APPEAL

On the facts alleged in the consolidated complaints, whether former President Donald J. Trump is entitled to absolute immunity from civil suit for the harm his conduct caused the Plaintiffs.

## INTRODUCTION

Former President Donald J. Trump asserts that he cannot be sued for conspiring with his supporters to obstruct the peaceful transfer of power on January 6, 2021. To support this extraordinary claim, Trump invokes the doctrine of presidential immunity, which shields presidents from civil suits for actions within the "outer perimeter" of their "official responsibilit[ies]." *Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982). The Constitution's text and structure, however, make clear that Trump was acting far beyond the "outer perimeter" of his office when he conspired to use violence and intimidation to prevent members of Congress from carrying out their constitutional duty to count Electoral College votes and certify the results of the 2020 presidential election.

Trump claims that obstructing Congress's count of electoral votes was a proper exercise of his responsibilities under the Take Care Clause of the Constitution. But the Constitution deliberately excludes the president from the process of casting and counting Electoral College votes, foreclosing any possibility that Trump's actions on January 6 could constitute legitimate efforts to "Take Care that the Laws be faithfully executed."

1

Nor can Trump's other principal justification for his actions, that he was speaking to the assembled crowd about matters of public concern, insulate him from liability. Virtually every statement made by a president is a matter of public concern, precisely because the president, as a prominent figure, is the speaker. Trump's argument therefore runs afoul of *Clinton v. Jones*, 520 U.S. 681, 695 (1997), which held that immunity is "grounded in the nature of the function performed, not the identity of the actor who performed it."

Ultimately, the immunity Trump seeks would cause irreparable harm to the legitimacy of the presidency. Our constitutional structure relies on a fundamental principle: "divide power everywhere except for the presidency and render the President directly accountable to the people through regular elections." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2203 (2020). Thus, under the Framers' design, the Constitution vests the presidency with tremendous powers precisely because the president is the "most democratic and politically accountable official in Government." *Id.* To ensure that the American people can hold the president accountable through elections, the Framers carefully structured the transfer of presidential power to shield it from corrupting outside interference, most notably by the incumbent president who the Framers understood would face enormous temptation to manipulate the process to his own ends. *See* The Federalist No. 68 (Alexander Hamilton). By sending a mob after members of

Congress and the President of the Senate as they counted Electoral College votes, in violation of the Ku Klux Klan Act and other laws, Trump undermined the transfer of power in precisely the manner the Framers sought to guard against.

Plaintiffs are eleven members of Congress and two Capitol Police Officers sworn to protect them.  They all suffered psychological and, in some cases, physical injuries as a result of the January 6 attack on the Capitol.  Trump is not entitled to immunity for his role in causing this harm.

## STATEMENT OF THE CASE

## I.     FACTUAL HISTORY[1]

After a months-long effort to overturn the results of the 2020 election, Donald Trump assembled an angry crowd on January 6 and dispatched it to the Capitol to disrupt Congress's count of the Electoral College votes.  The rioters caused injuries to the Plaintiffs that are the focus of the complaints in these consolidated civil lawsuits.

---

[1] The following is a recitation of the facts alleged in the complaints from the three cases consolidated in this appeal, among which there is substantial overlap.  This summary is consistent with the summary recited and assumed to be true by the district court for the purpose of ruling on the defendants' motions to dismiss.  JA 207.

### A.    Trump Sowed Doubt in the Integrity of the Election Before Votes Were Cast

In the weeks leading up to the November 2020 election, Trump questioned the legitimacy of the results by warning: "[T]he only way they can take this election from us is if this is a rigged election."  JA 150, ¶ 33.  Trump repeatedly claimed (without evidence) that the election would be tainted by "fraud" and that his opponents were "trying to steal" the election.  JA 22, ¶¶ 13, 16.  He also publicly defended and solicited the help of violent supporters.  *See, e.g.*, JA 150, ¶ 31 (Trump praised violent protests by the "Trump Army"); *id.* ¶ 30 (when asked to condemn the Proud Boys and their violent tactics, Trump instead told them: "Proud Boys, stand back and stand by."); *cf. id.* ¶ 32 (when a mob of Trump supporters swarmed a Biden campaign bus on the highway leading to the cancellation of campaign events, Trump tweeted: "These patriots did nothing wrong").

### B.    Trump Tried Unsuccessfully to Overturn the Election Results Throughout November and December

 On November 7, 2020, all major news outlets called the election for Joe Biden.  JA 25, ¶ 20.  In the days and weeks that followed, Trump employed a number of strategies to overturn the election results.

The Trump campaign and its allies filed more than sixty lawsuits in state and federal courts challenging the election results.  JA 151, ¶ 36.  No court found

evidence of voter fraud or other alleged irregularities sufficient to change the outcome. *Id.* ¶ 37.

Nonetheless, Trump continued to insist that the election had been stolen, publicly attacking state election officials who refused to say that he had won. JA 80-83, ¶¶ 36, 40, 49; JA 153-154, ¶¶ 47, 50. For example, when Georgia's Secretary of State found no evidence of widespread voter fraud, Trump called him an "enemy of the people," prompting threats on the Secretary's life. JA 153, ¶ 47. On December 1, 2020, a Georgia election official publicly pleaded: "Mr. President … Stop inspiring people to commit potential acts of violence. Someone is going to get shot, someone is going to get killed. And it's not right." JA 29, ¶ 29. But Trump persisted, attacking officials in Michigan and Arizona as well. JA 81, ¶ 40; JA 153-54, ¶¶ 44, 50. Trump also pressured officials in Michigan, Pennsylvania, and Georgia—including state legislators—to overturn the election results. JA 80-84, ¶¶ 37-54.

Throughout this period, Trump promoted rallies, protests, and other public events, all attacking the election results as illegitimate. JA 25-29, ¶¶ 21-29; JA 155, ¶ 54. Some of these events turned violent. JA 25, ¶ 22.

Despite Trump's efforts, no state reversed its certified election results, and on December 14, 2020, the Electoral College met and cast its votes—306 for Biden and 232 for Trump. The election was over.

### C.    Trump and His Campaign, in Concert with Violent Extremist Groups, Planned a Campaign Rally for January 6, 2021

Bereft of other means to remain in office, Trump turned his attention to Congress.  Working through his campaign, Trump organized a "Save America" rally for January 6—the day Congress was set to count the Electoral College votes. JA 159, ¶¶ 68–69.  The campaign made direct payments of $3.5 million to rally organizers, who worked with Trump to convene the event.  *Id.*  Trump personally selected the speakers and the music.  *Id.*

On December 19, 2020, Trump urged supporters to meet him at the Save America rally, tweeting: "Big protest in DC on January 6th.  Be there, will be wild!"  JA 155, ¶ 55.  In response to the tweet, Trump's supporters posted on social media: "THE COMMANDER IN CHIEF HAS ISSUED HIS ORDERS"; "If you've been waiting for a signal, THAT'S IT"; and, recalling Trump's "stand by" message to the Proud Boys during the first presidential debate, "Roger that. Standing by no longer."  JA 155-156, ¶¶ 56-57.

On December 19, 22, and 25, 2020, the Oath Keepers—a violent militia group—posted Facebook messages announcing an alliance with the Proud Boys "to work together and shut this shit down," crediting Trump with having "called [them] to the Capitol" where he "wants [them] to make it wild," and announcing that they had "orchestrated a plan with the Proud Boys."  JA 157, ¶ 63.  The two groups provided their members with tactical gear to use at the Capitol, including

protective vests, military-style communication equipment, and bear mace.  JA 158, ¶ 65.  The Oath Keepers also provided "military training" for Trump supporters planning to travel to D.C. on January 6.  JA 172, ¶ 127.  And the Proud Boys set up a secure, encrypted communications channel called "Boots on the Ground" to coordinate the group's activities.  JA 158, ¶ 65.

In posts on social media sites monitored by Trump and his advisors, Trump supporters agreed to meet at specific "rally points" for travel to D.C. on January 6 and recommended that their fellow rallygoers bring pepper spray, batons, tasers, bullet-proof vests, and knives.  JA 156, ¶ 60.  Some called for "mass hangings and firing squads."  JA 156, ¶ 61.

Media outlets including Fox News reported on the violent posts disseminated by Trump's followers.  JA 158, ¶ 66.  And in widely publicized remarks, former White House homeland security official Olivia Troye warned that "there will be violence on January 6th because the president himself encourages it."  *Id.*  Law enforcement, including the FBI, also warned that the protests on January 6 would be violent.  *Id.*

Rather than discourage violence, Trump unleashed his supporters on the Capitol.  In a series of messages leading up to the rally, Trump falsely told supporters that there was still time to change the outcome of the election, that states wanted to "correct their votes," and that Mike Pence, as President of the

Senate, could send Electoral College votes "back to the States." JA 32-34, ¶ 38; JA 160, ¶ 75. And on the morning of January 6, Trump sent a tweet claiming that he could still win the election: "All Mike Pence has to do is send [the election] back to the States, and WE WIN," notwithstanding that this course of action would have required Pence and Congress to violate their constitutional duties and oaths of office. JA 160-161, ¶ 75-78.

### D. Trump Inflamed the Crowd and Directed It to March to the Capitol with Him While Congress Was Inside Counting the Electoral Votes

Taking the stage at the Save America rally, Trump spoke to a screaming, agitated crowd, repeating his claims that the election had been stolen. He told the crowd that if Congress certified the results of the election, they would "have an illegitimate president" and "we can't let that happen." JA 164-165, ¶ 87. He then assured them that "when you catch somebody in a fraud, you're allowed to go by very different rules…" *Id.* ¶ 88.

As the crowd became more inflamed, Trump provoked them further, shouting: "Something is wrong here, something is really wrong, can't have happened and we fight, we fight like hell, and if you don't fight like hell, you're not going to have a country anymore…The radical left knows exactly what they're doing. They're ruthless and it's time that somebody did something about it." JA

163-164, ¶¶ 85-88.  In response, the mob began chanting "Fight like hell" and "Fight for Trump."  JA 38, ¶ 61.

As the crowd reached a fever pitch, Trump directed them to the Capitol, just as he had previewed to rally organizers, and despite the fact that the event permit was limited to the Ellipse, announcing: "[W]e are going to … walk down Pennsylvania Avenue …, and we are going to the Capitol, and we are going to try and give … our Republicans, the weak ones because the strong ones don't need any of our help, we're … going to try and give them the kind of pride and boldness that they need to take back our country."  JA 159, ¶ 69; 165, ¶89-90.  The crowd shouted and chanted, "Storm the Capitol," and "Take the Capitol right now."  JA 38, ¶ 61; JA 164-165, ¶ 88.  At Trump's command, they marched toward the Capitol building, where the Proud Boys had already gathered in military formation. JA 166-167, ¶¶ 94, 98–100.

At approximately 12:53 p.m., the Proud Boys broke through the outer barriers surrounding the Capitol.  JA 39-40, ¶ 66.  Joined by the Oath Keepers and the mob that Trump dispatched from the Save America rally, the Proud Boys overwhelmed the Capitol Police.  JA 166-167, ¶¶ 94, 98–100.  Trump watched video reports of the attack on the Capitol and, at 1:49 p.m., he tweeted a video of his rally remarks in which he had called upon the crowd to "fight like hell."  JA 104, ¶ 128.

By 2:12 p.m., rioters had kicked and bludgeoned their way through the windows of the Capitol and opened the doors to their fellow rioters, who descended on the halls of Congress.  JA 104-105, ¶ 134; JA 44, ¶ 90.  Some had guns.  *Id.* ¶ 91.  Some wore helmets and tactical gear.  *Id.*  Many carried baseball bats, hockey sticks, fire extinguishers, stolen police shields, collapsible batons, and Trump flags*.  Id.*  They yelled at Capitol Police: "We were invited here by the President of the United States."  *Id.* ¶ 93.  And: "You're outnumbered.  There's a fucking million of us out there.  And we are listening to Trump—your boss."  JA 170-171, ¶ 122.

The invasion forced the House and Senate into recess.  JA 195, ¶ 239; JA 44, ¶ 92.  While many members of Congress were evacuated from the House chamber, others, including Rep. Swalwell and several Bass Plaintiffs,[2] were trapped in the House chamber as rioters fought to break in.  JA 183, ¶ 182; JA 72-73, ¶¶ 6, 11. Drawing their guns, Capitol Police instructed the trapped members to put on their gas masks and lie flat on the gallery floor.  *Id.*; JA 181, ¶ 175.

---

[2]The district court referred to Plaintiffs in *Thompson* as the "Bass Plaintiffs" because Representative Bennie G. Thompson, the original lead plaintiff, voluntarily dismissed his claims with prejudice after his appointment as Chair of the Select Committee to Investigate the January 6th Attack on the United States Capitol.  The caption in this case has remained unchanged.

One floor below, in the Capitol's Crypt, Officer Blassingame and a handful of fellow Capitol Police officers were overwhelmed by an angry mob, who pummeled the uniformed officers with fists, flagpoles, and other weapons.  JA 46-47, ¶ 106-109; JA 181, ¶ 175; JA 183, 182.

In the Senate chamber, the Secret Service ushered Vice President Pence to safety as the mob surrounding the Capitol—where a gallows had been erected on the lawn—shouted, "Hang Mike Pence!" and "Mike Pence is a traitor."  JA 44, ¶ 92; JA 48, ¶ 117; JA 106-107, ¶¶ 135, 140.

Witnesses described Trump as "delighted" as he watched the chaos unfold on television and "confused about why other people on his team weren't as excited as he was."  JA 44-45, ¶ 94.  Twelve minutes after rioters breached the Capitol building, Trump encouraged them further, tweeting: "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution."  JA 107, ¶138.  Rioters read this tweet aloud from the Capitol steps and repeated it over megaphones.  *Id*. ¶139.

House Minority Leader Kevin McCarthy called Trump and pleaded with him to call off the rioters, emphasizing that they were all Trump supporters.  Trump responded, "Well, Kevin, I guess these people are more upset about the election than you are."  JA 171, ¶ 123.

Later that afternoon and evening, after law enforcement regained control of the Capitol, Trump finally told the rioters to go home, but he praised their actions. In a recorded video tweeted at 4:17 p.m., he said: "Go home. We love you. You're very special." JA 49-50, ¶ 125. At 6:01 p.m., Trump tweeted: "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. Go home with love & in peace. Remember this day forever!" JA 174-175, ¶ 140.

By that time, the mob had caused serious physical and emotional injuries to more than 140 police officers, including Officers Blassingame and Hemby, and terrorized members of Congress. JA 46-47, ¶ 109; JA 51-53, 134-137, 142-145; JA 109, ¶ 149. The mob shattered windows, damaged statues, broke down doors, vandalized offices, stole laptops, shattered a mirror, desecrated the Speaker's office, and stole the Speaker's lectern. JA 109, ¶ 149. Fifty officers were hospitalized. JA 175, ¶ 143. Six people lost their lives. JA 109, ¶ 149.

## II.    PROCEDURAL HISTORY

This appeal concerns three cases that this Court consolidated for appeal after the district court denied in part Trump's motions to dismiss on immunity grounds.

### A. *Thompson v. Trump*

In *Thompson*, ten members of the House of Representatives suing in their personal capacities brought a claim under 42 U.S.C. § 1985(1) against six defendants, including Trump.  JA 214.  Section 1985(1), passed as part of the Ku Klux Klan Act of 1871, makes it illegal to conspire to injure or intimidate federal officials to prevent them from holding office or discharging their duties.

In relevant part for this appeal, Trump moved to dismiss the *Thompson* complaint on the grounds the claim was barred by absolute presidential immunity and otherwise failed to state a claim.  *Id*.

### B. *Swalwell v. Trump*

In *Swalwell*, Representative Eric Swalwell brought federal and state law claims against four defendants, including Trump and Representative Mo Brooks. JA 215-216.  Swalwell brought the federal claims under section 1985(1) and 42 U.S.C. § 1986.  JA 204-206.  The latter makes it unlawful for an individual with knowledge of an unlawful conspiracy in violation of section 1985(1) to negligently fail to prevent the conspiracy from achieving its objective.  *Id*.  Here, too, Trump moved to dismiss all claims on the grounds of presidential immunity and failure to state a claim.  *Id*.

In addition, Representative Brooks sought a scope-of-office certification under the Westfall Act, 28 U.S.C. § 2679.  *Id*.  Under the Westfall Act, if the

Attorney General certifies that a tort claim against a government employee arises

from conduct performed while "acting within the scope of his office or

employment," the United States is substituted as the defendant.  28 U.S.C.

§ 2679(d)(1).  The Attorney General refused to grant Brooks' certification request,

citing the campaign nature of Brooks' conduct and noting that "inciting or

conspiring to foment a violent attack on the United States Congress is not within

the scope of employment of a Representative—or any federal employee."  Brief of

the Department of Justice, No. 21-cv-586, ECF No. 33 at 21.[3]

### C.    *Blassingame v. Trump*

In *Blassingame*, Capitol Police Officers James Blassingame and Sidney

Hemby, who were physically injured during the attack on the Capitol, brought

eight claims against Trump, including a violation of section 1985(1) and claims

under District of Columbia law.  JA 216-217.  As with *Thompson* and *Swalwell*,

Trump moved to dismiss on presidential immunity grounds and for failure to state

a claim.  *Id*.

### D.    The District Court's Order and this Appeal

Regarding Plaintiffs' section 1985(1) claims and relevant D.C. law claims,

the district court denied Trump's motions to dismiss predicated on his assertion of

---

[3] The House of Representatives declined Westfall certification on the same
grounds.  Response Brief of the General Counsel for the U.S. House of
Representatives, No. 21-cv-586, ECF No. 32 at 1-2.

presidential immunity.  The court rejected Trump's arguments that he was carrying out his constitutional duties under the Take Care Clause and speaking on a matter of public concern, calling Trump's Take Care Clause argument "misleading and wrong as a matter of law" and finding the speech of public concern argument "too simplistic."  JA 229.

With respect to the Take Care Clause, the district court examined the procedures for counting Electoral College votes and finalizing the result and found that "[a] sitting President is prescribed no role" in that process by either the Constitution or any statutory law.  JA 230.  Rather, the court observed, "the Vice President, acting as President of the Senate, and Members of Congress had constitutionally …prescribed duties to carry out the Certification" of the Electoral College vote.  JA 231.  "Their actions," the court explained, "are those of a co-equal branch, not subject to Executive Branch control" and so "President Trump's advocacy of the scope of their duties and how they should be performed therefore falls outside even the expansive Take Care Clause."  JA 231-232.

Evaluating Trump's argument that "whenever and wherever a President speaks on a matter of public concern he is immune from civil suit," the district court held that this proposed test "goes too far."  JA 234.  Such a test, the district court explained, would "mirror" an immunity grounded in the "identity of the

[President's office]," which the Supreme Court has expressly said cannot be the basis for absolute immunity. *Id.* (citing *Clinton*, 520 U.S. at 695).

Instead, the district court held that the "better course" is "to evaluate the defense on the specific acts alleged and, based on those facts, determine whether President Trump's words were spoken in furtherance of a presidential function." JA 237. Reviewing Article II of the Constitution and federal statutory law, the district court "start[ed] from the following premise": "The Office of the President has no preference for who occupies it." JA 238. "A function of the presidency is therefore *not* to secure or perpetuate incumbency." *Id.* (emphasis in original).

The district court then concluded that "Plaintiffs' allegations against President Trump accuse him of doing just that: devoting his last weeks in office to continuing his term as President of the United States through the Electoral College vote and certification process, even though he did not prevail in the general election." *Id.* The district court based its conclusion on a careful examination of Trump's actions, as alleged in Plaintiffs' complaints, all of which would have helped him remain president after his term ended. JA 238-241.

Because Trump's actions, including his speech at the Save America rally, were facially related to Trump's personal interest in remaining president, rather than any function of the office itself, the court held his conduct was not "in furtherance of any official duty" and thus not entitled to presidential immunity on

all but a single claim across the three complaints.  JA 241.  On that single claim for

which the court found Trump entitled to immunity—Plaintiff Swalwell's failure-

to-prevent claim under 42 U.S.C. § 1986—the district court determined that Rep.

Swalwell's allegation that "[Trump] had the power to stop the rioters but refused

and, instead, encouraged them," premised liability on a failure to exercise

presidential authority and thus was covered by presidential immunity.  JA 242.

Trump timely noticed his appeal in all three cases, and the Court

consolidated them for purposes of the appeal.

## SUMMARY OF THE ARGUMENT

Presidents do not enjoy blanket immunity from liability for their actions.

Presidential immunity is "grounded in the nature of the function performed, not the

identity of the actor who performed it."  *Clinton*, 520 U.S. at 695 (cleaned up).

Because immunity is derived from the functions the Constitution assigns to the

president, it protects presidents from civil suits only for acts within the "outer

perimeter" of their official responsibilities.  *Nixon*, 457 U.S. at 756.  In

determining whether a president's actions fall within the "outer perimeter" of the

presidency, courts ask whether the "sphere of protected action" is closely related to

the "immunity's justifying purposes."  *Id*. at 755.  Accordingly, courts weighing an

immunity request must determine whether shielding the president from suit is

necessary to protect the "President's unique office" and the constitutionally

mandated separation of powers in which immunity is "rooted." *Id*. at 749. The district court correctly applied these principles to deny immunity in this case.

The Constitution forecloses Trump's claim to immunity, as it excludes the president from the very process of casting and counting Electoral College votes in which Trump interfered. Instead, the Constitution assigns these tasks to the Electoral College, the President of the Senate, and Congress. The exclusion of the president from the process was intentional, as the Framers feared that an incumbent president might abuse his power to subvert it. *See* The Federalist No. 68 (Alexander Hamilton). Granting Trump the immunity he seeks for his interference in the Electoral College vote count would undermine this deliberate choice and the constitutional separation of powers.

Furthermore, under our system of government, neither presidents nor the courts have the authority to override or impede Congress's exercise of its sole prerogatives. *See, e.g.*, *NLRB v. Noel Canning*, 573 U.S. 513, 555 (2014). Trump's incursion into the exclusive province of Congress, therefore, necessarily exceeds the "outer perimeter" of the president's responsibilities and is not entitled to immunity.

Moreover, immunizing Trump's conduct here would erode—rather than protect—the legitimacy of the presidency. In crafting the Constitution, "[t]he Framers created a structure in which 'a dependence on the people' would be the

18

'primary control on the government.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 501 (2010) (quoting The Federalist No. 51, at 349 (James Madison)).  The Constitution grants the president broad power precisely because the president is "the most democratic and politically accountable official in Government." *Seila Law LLC*, 140 S. Ct. at 2203.  Trump's efforts to remain in office notwithstanding his election loss were an affront to the will of the voters and at odds with the very notion of accountability on which the president's legitimacy rests.  As a result, they fall well beyond the outer perimeter of the presidency.

Ignoring this constitutional framework, Trump instead argues that: (i) the Take Care Clause of the Constitution entitles him to interfere with the discharge of duties exclusively entrusted to Congress by the Constitution and statute; and (ii) his actions are shielded from liability because they related to a matter of public concern, ensuring that virtually anything a president says would be accorded immunity.  Accepting these arguments would turn the Constitution on its head.

The Take Care Clause of Article II—the only textually grounded constitutional power on which Trump relies—requires the denial, not the grant, of immunity here.  Launching a direct attack on Congress while it is discharging its constitutional and statutory duties cannot conceivably qualify as "tak[ing] Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3, cl. 5.  To conclude otherwise would give presidents the unlimited ability to retain power by any means

19

they deem necessary, precisely the sort of abuse the Constitution is designed to prevent.

Lacking any constitutional basis for his claim to immunity, Trump resorts to the unprecedented theory that because he spoke on a "matter of public concern" on January 6, he is entitled to immunity, regardless of whether his "speech" served a function of the presidency.  But Trump makes no attempt to tether this argument to *Nixon* and *Clinton*—binding authority in any immunity inquiry.  Nor can he.  A "speech on a matter of public concern" standard would essentially immunize every statement made by a president—if only by virtue of his notoriety.  Ignoring the admonition of *Nixon* and *Clinton*, this standard would confer immunity based on the identity of the speaker, not the nature of the function performed.

Finally, Trump's prudential arguments are unpersuasive.  Trump's impeachment acquittal has no bearing on whether he can be held civilly liable in his personal capacity under a federal statute or D.C. law.  Nor would this lawsuit—given its unique facts—open the floodgates to litigation against current or former presidents.

In sum, there is simply no constitutional basis for Trump's immunity claim.  It is inconceivable that he was carrying out any function of the presidency when he directed his supporters to use violence and intimidation to halt the constitutionally prescribed process for counting Electoral College votes.  To the contrary, he was

20

doing the very opposite of what our Constitution, and our nation's two-hundred-year history of peaceful transfers of power, demand of a sitting president. There is no justification for granting Trump immunity for his role in the "single most deadly attack on the Capitol by domestic forces in the history of the United States." *Trump v. Thompson*, 20 F.4th 10, 35 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022).

The district court's denial of immunity should be affirmed.

## LEGAL STANDARD

Where, as here, courts are asked to evaluate claims of presidential immunity at the pleadings stage, they "assume the truth of the …factual allegations in the complaint," *Clinton*, 520 U.S. at 685, and ask whether the acts alleged fall within the "outer perimeter" of the president's responsibilities, *Nixon*, 457 U.S. at 756. An "official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991).

## ARGUMENT

The doctrine of presidential immunity shields the president from civil lawsuits that seek to penalize him for performing "the duties of his office." *Nixon*, 457 U.S. at 752. As the Supreme Court explained, presidents must be able to "perform their designated functions effectively without fear that a particular

decision may give rise to personal liability." *Clinton*, 520 U.S. at 693. This reasoning, however, "provides no support for an immunity for *unofficial* conduct." *Id.* at 693-94. A president can therefore be sued for taking actions beyond "the 'outer perimeter' of his official responsibility." *Nixon*, 457 U.S. at 756.

Trump's conduct on January 6, 2021, fell beyond the scope of his official responsibilities. *Nixon*, 457 U.S. at 752. The complaints allege that Trump urged, aided, and abetted what this Court has called an "insurrection" and a "grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284-85 (D.C. Cir. 2021), *judgment entered*, 844 F. App'x 373 (D.C. Cir. 2021). For purposes of this appeal, those allegations must be taken as true.

Had Trump personally joined the rioters at the Capitol, as he planned and promised, JA 164, ¶ 87, no one would reasonably contend that he was acting within the outer limit of his office or carrying out a function that the Constitution assigns to the president. By the same token, conspiring with violent groups to use force, intimidation, or threats against members of Congress to stop them from certifying election results is not one of the president's responsibilities. As constitutional history and common sense both teach, "[a]id[ing] insurgents in a mediated conspiracy or insurrection against the government" is not an "official act[]." 2 J. Story, Commentaries on the Constitution of the United States § 802 (1833); *see also* U.S. Const. amend. XIV, § 3. More generally, presidential action

that undermines the constitutional process for the peaceful transition of power or

disrupts the balance of power between the three branches of government cannot be

considered "official" conduct.  Trump can therefore be sued for the injuries he

caused on January 6.

## I. THE SCOPE OF PRESIDENTIAL IMMUNITY IS DEFINED BY THE SEPARATION OF POWERS AND THE STRUCTURE OF THE PRESIDENCY, BOTH OF WHICH PRECLUDE IMMUNITY HERE

Presidential immunity extends only as far as is necessary to preserve both

the presidency and the separation of powers.  Because Trump's actions, as set forth

in the complaints, subverted our constitutional design—and cannot be reconciled

with any plausible understanding of the presidency and its powers—Trump lacks

any valid claim to immunity here.

### A. Courts Must Look to Constitutional Text and Structure, Along with Presidential Immunity's Justifying Purposes, When Determining Whether Specific Acts Are Immune

The Constitution does not expressly confer immunity on the president.  *See*

U.S. Const. art. II.  Rather, presidential immunity from civil suit is a judicially

created doctrine "rooted in the constitutional tradition of the separation of powers."

*Nixon*, 457 U.S. at 749.  Because immunity exists for the sole purpose of

protecting the president's ability to discharge the responsibilities of the office, it

does not shield every act "of the individual who happens to be the President."

*Clinton*, 520 U.S. at 701.  Instead, the Supreme Court has conferred immunity on

23

presidents only for "official acts" within "the 'outer perimeter' of [their] official responsibility." *Nixon*, 457 U.S. at 756.

In defining the "outer perimeter" of the president's office, courts consider the "special …functions" that the Constitution assigns the president, as well as our general "constitutional heritage and structure." *Id.* at 748, 756. The "sphere of protected action must be related closely to the immunity's justifying purposes," including the "constitutionally mandated separation of powers," and the constitutional structure of the presidency. *Id.* at 748, 755; *see also Clinton*, 520 U.S. at 691, 694.

The district court faithfully applied these principles, explaining that it would determine whether Trump's conduct was within the "outer perimeter" of his duties by "consider[ing] the relationship of the challenged conduct to the claimed corresponding function of the President," as well as "separation-of-powers considerations." JA 238.[4]

---

[4] The district court pointed to this Court's decision in *Banneker Ventures v. Graham*, 798 F.3d 1119, 1139 (D.C. Cir. 2015), as a prototypical application of the principle that absolute immunity analyses must be functional. JA 237. Trump (Br. at 15-16) erroneously seizes on the court's reliance on this decision and suggests that the court improperly determined that the same immunity analysis governs both transit officials and the President of the United States. But the court pointed to *Banneker* only to reaffirm that immunities require functional analyses—just as *Nixon* and *Clinton* require. And, in any event, the court went on to make clear that the immunity analysis for the president involved "separation-of-powers considerations" not present in *Banneker*. JA 238.

B.     **Neither the Constitution's Text or Structure, Nor the Justifying Purposes of Presidential Immunity, Requires Immunity Here**

Under *Nixon*'s functional test, Trump's alleged misconduct was beyond the "outer perimeter" of his official responsibilities for three independent but mutually reinforcing reasons. First, Trump interfered with the constitutional process for counting electoral votes, even though the Constitution goes to great lengths to exclude sitting presidents from this process. Second, Trump obstructed Congress's performance of its express, exclusive constitutional duties and trampled express congressional immunities. Third, immunizing Trump's conduct would weaken the presidency by diminishing the American public's ability to choose who occupies that office. Thus, immunizing Trump's conduct would warp the very constitutional structure that immunity exists to preserve.

1.     <u>Trump Interfered with the Constitutional Process for Counting the Electoral Votes</u>

By dispatching an agitated crowd to Congress during the electoral vote count, Trump directly interfered with the constitutional process for the peaceful transfer of power. Fearing precisely this sort of interference, the Framers created a constitution that shields the transfer of power from incumbent presidents at every turn. States, not the president, determine the manner of appointing presidential electors. U.S. Const. art. II, § 1, cl. 2. And Congress, not the president, determines the date on which those appointments must be made. U.S. Const. art. II, § 1, cl. 4.

25

Once appointed by the states, members of the Electoral College "meet in their respective states and vote by ballot for President and Vice-President," U.S. Const. amend. XII, on a date chosen by Congress, U.S. Const. art. II, § 1, cl. 4. Those votes are then recorded and transmitted to the President of the Senate, who, on a date chosen by Congress, opens the certificates for the votes to be counted. U.S. Const. amend. XII. The Constitution gives the president no role whatsoever in the process. The omission of the president from this carefully crafted constitutional scheme is "equivalent to an express prohibition" on his participation. *Clinton v. City of New York*, 524 U.S. 417, 439 (1998) (Constitution's silence on the line-item veto was akin to a prohibition).

Additional constitutional safeguards against presidential interference in the casting and counting of electoral votes confirm the Framers' understanding that keeping the president away from this process was essential to the president's continued accountability to the people through the electoral system. They took great care to ensure that members of the Electoral College "enter[ed] upon the[ir] task free from any sinister bias," including the influence of the incumbent president, who would (human nature being what it is) have strong motives to retain his own grip on power. The Federalist No. 68 at 411 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Accordingly, they ensured that Electoral College meetings take place in the states, rather than in the national capital, where the

president resides.  U.S. Const. amend. XII.  They further prescribed that

presidential appointees cannot serve as electors because they "might be suspected

of too great devotion to the President in office."  *Id.* (discussing U.S. Const. art. II,

§ 2).  Nor can such officers (or the president himself) serve as members of

Congress.  U.S. Const. art. I, § 6.[5]  Thus, beneficiaries of the president's

appointment power can neither cast nor count electoral votes. The Framers

similarly made the Electoral College a temporary body in order to guard against

political influence and corruption, which often "require[] time."  The Federalist

No. 68, at 411 (Alexander Hamilton).

 The Framers, each of whom had lived under the reign of a monarch, were

determined that the United States would never have an absolute ruler, but rather a

president.  *See* The Federalist No. 69, at 414 (Alexander Hamilton).  They

anticipated that, in most instances, the "personal motives" and "ambitions" of the

president would be aligned with the interests of his office, creating an energetic but

accountable chief executive.  The Federalist No. 51, at 319 (James Madison).

---

[5] Alexander Hamilton described this clause as an "important guard[] against the
danger of executive influence upon the legislative body."  The Federalist No. 76, at
457 (Alexander Hamilton); *see also* 2 J. Story, Commentaries on the Constitution
of the United States § 866 (1833) ("The other part of the clause, which disqualifies
persons holding any office under the United States from being members of either
house during their continuance in office, has been still more universally applauded;
and has been vindicated upon the highest grounds of public policy.").

During the casting and counting of Electoral College votes, however, the interests of the president (as a person) and presidency (as an institution of government) could pull in opposite directions. In this most delicate constitutional moment, an incumbent president would face great temptation to abuse his position to subvert the process in his or his party's favor; the Constitution therefore excludes the president from the electoral vote counting process. *See* The Federalist No. 68 (Alexander Hamilton). Holding that Trump's interference with this process falls within the outer perimeter of the president's responsibilities would do grave damage to this careful constitutional design and threaten the peaceful transfer of power in the future.

2.     Trump Obstructed Congress's Performance of Its Own
        Constitutional Duties

Trump also disrupted the constitutionally mandated separation of powers by invading a coordinate branch of government as it carried out its own constitutional duties. In both *Nixon* and *Clinton*, the Supreme Court emphasized that presidential immunity is a doctrine justified by the constitutional separation of powers. *Clinton*, 520 U.S. at 699-700; *Nixon*, 457 U.S. at 749. When the district court exercised jurisdiction here, the "[c]ourt act[ed], not in derogation of the separation of powers, but to maintain their proper balance." *Nixon*, 457 U.S. at 754.

By assigning the count of electoral votes solely to Congress, the Constitution deploys the separation of powers as an additional structural safeguard to prevent

presidential encroachment on that process.  "The doctrine of separation of powers is concerned with the allocation of official power among the three coequal branches of our Government." *Clinton*, 520 U.S. at 699.  By dividing power among three branches of government, the Constitution creates "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 122 (1976)). Like the Take Care Clause (discussed further below), the separation of powers preserves "electoral accountability," *Collins v. Yellen*, 141 S. Ct. 1761, 1783-84 (2021), and acts as a "bulwark against tyranny," *United States v. Brown*, 381 U.S. 437, 442-43 (1965).  Accordingly, neither presidents nor courts have the power to override or impede Congress's exercise of its exclusive constitutional powers.  *See*, *e.g.*, *Noel Canning*, 573 U.S. at 555 (holding that neither courts nor the president may override Congress's determinations of when it is and is not in recess); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588 (1952).  Defining the outer perimeter of the presidency to encompass interference with the counting of Electoral College votes would therefore intrude on Congress's own exclusive sphere of power, in blatant violation of the constitutional separation of powers that

"restrains each of the three branches of the Federal Government from encroaching on the domain of the other two." *Clinton*, 520 U.S. at 691.[6]

Stretching an implied presidential immunity to include the conduct alleged here would also trample on not one, but two, *express* immunities that the Constitution confers *on Congress* in order to protect the separation of powers. Members of Congress enjoy a "privilege[] from Arrest during their Attendance" at sessions of Congress.  U.S. Const. art. I, § 6.  And they enjoy both absolute criminal and civil immunity from suit and a testimonial privilege for "any Speech or Debate in either House."  U.S. Const. art. I, § 6.  These clauses "help[] maintain the separation of powers among the three Branches" by "assur[ing] Members of Congress 'wide freedom of speech, debate and deliberation *without intimidation or threats from the Executive Branch*.'"  *In re Grand Jury Subpoenas*, 571 F.3d 1200, 1204 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (quoting *Gravel v. United States*, 408 U.S. 606, 616 (1972)) (emphasis added).  Indeed, the Speech or Debate Clause's "purpose" "was to preserve the constitutional structure of separate, coequal, and independent branches of government" because English and American history taught that "any lesser standard would risk intrusion by the Executive and

---

[6] Likewise, defining the presidency to encompass the power to force Congress into recess—by directing a violent crowd to the Capitol—would impermissibly threaten Congress's constitutional powers. *See Noel Canning*, 573 U.S. at 551.

the Judiciary into the sphere of protected legislative activities." *United States v. Helstoski*, 442 U.S. 477, 491 (1979).  These constitutional protections for Congress would mean little if the president were free to engage in the kinds of threats and intimidation at issue here.

      3.     <u>Trump's Conduct on January 6 Falls Outside the Constitutional Structure of the Presidency Because it Threatened the Very Electoral Accountability That Gives the Office its Powers</u>

Finally, Trump's conduct on January 6 damaged the presidency.  The *Nixon* Court identified one of the "justifying purposes" of presidential immunity as the need to protect the "unique office" of the presidency under the "constitutionally mandated separation of powers."  457 U.S. at 748-49, 755.  Granting immunity here would do the opposite.

The presidency has two interconnected, defining features that are "unique in our constitutional structure": (1) it concentrates executive power in a single person; and (2) it makes that person accountable to the American people through quadrennial elections.  *Seila Law*, 140 S. Ct. at 2203.  Indeed, it was to both "*justify*" and "check" the president's uniquely unitary political authority that the Framers "made the President the most democratic and politically accountable official in Government."  *Id.* (emphasis added).  The powers of the office are derived not from aristocratic entitlement but from the votes of the American public.  *See, e.g.*, *id*.

31

In crafting the presidency, "[t]he Framers created a structure in which 'a dependence on the people' would be the 'primary control on the government.'" *Free Enter. Fund*, 561 U.S. at 501 (quoting The Federalist No. 51). Consequently, the Supreme Court has repeatedly struck down congressionally imposed restrictions on presidential power where those restrictions would disrupt the clear chain of accountability to the electorate, grounding its analysis in the Take Care Clause. *E.g.*, *id.* at 484; *Seila Law*, 140 S. Ct. at 2203; *Myers v. United States*, 272 U.S. 52, 163-64 (1926); *cf. In re Aiken Cnty.*, 645 F.3d 428, 439–40 (D.C. Cir. 2011) (Kavanaugh, J., concurring).

To that same end, the Constitution contains other structures that ensure the people, not incumbent presidents or government officials they supervise, choose the next president. *See, e.g.*, *Davis. v. Fed. Election Comm'n*, 554 U.S. 724, 744 (2008) (holding that the use of public funds to advantage one political candidate over another runs afoul of the First Amendment); *Payment of Expenses Associated with Travel by the President and Vice President*, 6 Op. O.L.C. 214 (1982) (explaining the need to separate campaign conduct, which must be paid for with private funds, from official government business on the grounds that conduct relating solely to a president's attempt to retain office is not official). These two constitutional principles form two sides of the same coin. While the president's accountability to the people justifies his expansive powers over the executive

branch, the prohibitions on executive branch interference in the selection of the next chief executive ensure the people, not the incumbent, choose who will be president.

The district court correctly identified this constitutionally mandated obligation of non-interference when it recognized that "Article II of the Constitution …is agnostic as to whether a sitting President is elected to a new term" and held that "perpetuat[ing] incumbency" cannot be considered a presidential function.   JA 238.  Holding otherwise would incentivize a would-be autocrat to try to remain in power despite the public's will.  That obvious feature of basic democratic governance, unsurprisingly, has been recognized both by courts and the Department of Justice's Office of Legal Counsel, which have repeatedly emphasized that the responsibilities of government office do not include engaging in campaign activity.[7]

---

[7] *See, e.g.*, *Common Cause v. Bolger,* 574 F. Supp. 672 (D.D.C. 1982), *aff'd*, 461 U.S. 911(1983) (holding that House or Senate mailings aimed at "help[ing] incumbents gain reelection" are "unofficial communication[s]"); *Payment of Expenses Associated with Travel by the President and Vice President*, 6 Op. O.L.C. 214, 217 (1982) (the executive branch separates campaign conduct which must be paid for with private funds from official government business); *see also Mehau v. Reed*, 869 P.2d 1320, 1332-33 (Haw. 1994) (city employee not acting within the scope of his office when he "delivered [a] speech as a political candidate" because "[h]is candidacy was not part of his job"); *Ennis v. Crenca*, 587 A.2d 485, 490 (Md. 1991) (elected official's employment does not extend to "personal ventures such as electioneering [or] campaigning" because "[t]hose activities are undertaken for the sole benefit of the elected official"); *Anderson v.*

Maintaining the president's accountability to the people, free from disruption or interference, is especially important given both the vast and consequential powers of the office and the president's unique status as our only nationally elected leader.  The stakes of any interference are starker and graver where, as here, the incumbent's conduct concededly takes place well after the public has voted and seeks to impede the normal processes that would otherwise both formalize his loss and solemnize the orderly transfer of power.  Immunizing such disruption of the president's accountability to the people, destroys, rather than protects, the structure of his unique office.  For this reason, too, it would contravene constitutional text and structure to include interference in the count of electoral votes within the official duties of the office.

## II.     TRUMP'S CLAIMS OF PRESIDENTIAL POWER ARE DANGEROUSLY OVERBROAD AND DO NOT ENTITLE HIM TO IMMUNITY

Trump contends that he is entitled to immunity because he was taking care that the laws be faithfully executed and speaking on a matter of public concern.  Both arguments misconceive the scope of presidential immunity and the structure

---

*City of Inkster*, 2014 WL 3747545, at *2 (Mich Ct. App. July 29, 2014) (holding that "the campaign activities of an incumbent judge" running for reelection are "not within the scope of employment" because the effort "to further her reelection campaign" had to be characterized as "an individual interest, not an interest of the court"). *Cf. Gallant v. N.L.R.B.*, 26 F.3d 168, 172 (D.C. Cir. 1994) (holding that letters created for purpose of "retaining [official's] job" rested on "purely personal objective" and were personal, not agency, records).

of the Constitution.  Accepting them would frustrate the very separation-of-powers

values that presidential immunity exists to protect and transform presidential

immunity from a limited-purpose shield to "a loaded weapon ready for the hand"

of an incumbent willing to trample the Constitution in order to remain in power.

*Korematsu v. United States*, 323 U.S. 214, 246 (1944) (Jackson, J., dissenting).

### A.    Trump Was Not Taking Care that the Laws Be Faithfully Executed

The only specific constitutional provision on which Trump relies (Brief for

Appellant Donald J. Trump) (hereinafter, "Trump Br." at 27-31) is the Take Care

Clause, which requires that the president "take Care that the Laws be faithfully

executed."  U.S. Const. art. II, § 3, cl. 5.  But Trump cannot shield the conduct at

issue on that ground because, for each of the three reasons described above, he was

not executing a constitutional duty.  *See supra* at 25-28 (Constitution does not give

president a role in counting electoral votes); *supra* at 28-31 (interference in ballot

counting obstructs Congress's constitutional powers); *supra* at 31-34 (interference

to perpetuate president's incumbency undermines democratic accountability

necessary for the office).  Impeding the electoral vote count therefore cannot be an

exercise of any constitutional authority.

Nor can Trump credibly claim that he was "taking care" that any statute was

being faithfully executed.  The only federal statute at issue here is the Electoral

Count Act.  *See* Trump Br. at 31 (citing Electoral Count Act, Pub. L. No. 49-90, 24

35

Stat. 373 (1887), codified at 3 U.S.C. §§ 1-18).  That statute prescribes precisely

when the electoral vote count must happen, 3 U.S.C. § 15, how and when

objections will be heard and resolved, *id.* §§ 15, 17, and even where various

officials are to sit in the chamber, *id.* § 16.  The vice president serves solely in a

legislative capacity as President of the Senate, and the Electoral Count Act does

not contemplate any role for the president or any executive branch official he

supervises.  *See id*. at § 15 ("[T]he President of the Senate shall be their presiding

officer.").  The exclusion of the president—and all executive officers—from the

statute is not mere happenstance; it is necessary to maintain the carefully shielded

process for transferring power that the Constitution establishes and to protect the

separation of powers that is so vital to our democratic governance.  *See supra* at

28-31.

Unable to identify any role for the president in the counting of electoral

votes, Trump instead makes the remarkable claim that the Take Care Clause gives

the president boundless, nondescript powers to direct, influence, and even impede

(through violence if he deems necessary) the ability of other branches of

government to carry out their constitutionally assigned responsibilities.  *See* Trump

Br. 28 (asserting that "President Trump was addressing the faithful execution of

the constitutional and statutory order" when he engaged in the conduct detailed in

the complaints).  Accepting this argument would transform the president into a

strongman with absolute power to use any means to retain office, which is precisely the sort of abuse the Constitution's separation of powers is designed to prevent.  In fact, the president cannot exercise powers assigned exclusively to Congress, even where Congress expressly authorizes him to do so.  *See Clinton*, 524 U.S. at 438-40; *Gundy v. U.S.*, 139 S. Ct. 2116, 2134-35 (2019) (Gorsuch, J., dissenting); *New York v. United States*, 505 U.S. 144, 182 (1992) ("The Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment.").  A president thus cannot seize those powers for himself or "impair [Congress] in the performance of its constitutional duties." *Clinton*, 520 U.S. at 701 (quoting *Loving v. United States*, 517 U.S. 748, 757 (1996)); *accord Patchak v. Zinke*, 138 S. Ct. 897, 904-05 (2018); *Miller v. French*, 530 U.S. 327, 341–42 (2000); *New York*, 505 U.S. at 182; *Bowsher v. Synar*, 478 U.S. 714, 721–22 (1986); *I.N.S. v. Chadha*, 462 U.S. 919, 946 (1983); *Buckley*, 424 U.S. at 121–122; *Kilbourn v. Thompson*, 103 U.S. 168, 191 (1880).

Trump's reading of the Take Care Clause stands at odds with the entire concept of separation of powers.  His claim of immunity rests on a conception of presidential power so expansive it would put the presidency at war with Congress and the Constitution as a whole.

**B.    Trump's Actions Cannot Be Immunized on the Ground that He Was Speaking as President on a Matter of Public Concern**

Unable to justify his conduct as the performance of any identifiable power of the presidency, Trump is left only with the unprecedented assertion (Trump Br. at 14) that presidents enjoy absolute immunity for all speech on matters of public concern.  That argument fails for two reasons.  First, to the extent Trump offers a standard at all, it is untethered from the functional immunity analysis the Supreme Court required in *Clinton* and *Nixon*.  Second, what Trump proposes amounts to the kind of boundless, identity-based immunity that both *Nixon* and *Clinton* forbid.

1.    Trump's First Amendment Test is Untethered from the Constitutional Inquiry that Clinton and Nixon Require

Neither *Nixon* nor *Clinton* supports Trump's bid to import a sweeping First Amendment standard into the presidential immunity inquiry.  As explained above, presidential immunity exists only insofar as it can be "implied from the nature of the functions" assigned to the presidency by the Constitution.  *Nixon*, 457 U.S. at 749 (quoting 3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418-19 (1st ed. 1833)).  Thus, to qualify for immunity, presidential actions must further a specific presidential function found in or derived from the Constitution.  That is as true for presidential speech as it is for any other action undertaken by a president.  The district court therefore correctly rejected Trump's

"speech of public concern" test and concluded that presidential speech is immune only if it is "spoken in furtherance of a presidential function."  JA 229, 237.

Trump makes no effort to reconcile his argument with *Nixon* and *Clinton* or explain how, under those cases, all speech by a president on a matter of public concern necessarily furthers an official function of the presidency.  Instead, he offers only one justification for his novel and sweeping conception of presidential power: speaking on "matters of public concern" is something "Presidents ordinarily do."  Trump Br. at 14.  That statement is so vague as to be meaningless.[8]

Defining the scope of immunity in terms of what presidents "ordinarily do" violates *Nixon*'s and *Clinton*'s requirement that courts instead look to constitutional text and structure to define the scope of the president's official duties.  *Nixon* directs the court to ask whether Trump's conduct, including the

---

[8] Trump's embrace of "speech on matters of public concern" is also befuddling because the First Amendment protects remarks by public officials when they speak in their *private capacities,* not when they are carrying out governmental functions. *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., IL*, 391 U.S. 563, 568 (1968).  By contrast, public employee speech is "largely unprotected" by the First Amendment if it is "part of what the employee is paid to do"—*i.e.*, related to their official responsibilities. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps. Council 31*, 138 S. Ct. 2448, 2471, 2473-74 (2018).  Because the First Amendment's "speech on matters of public concern" standard has *no application at all* when a public employee is speaking in an official capacity, this test is a particularly unsuitable mechanism for determining whether certain speech falls within the "outer perimeter" of a president's official responsibilities. *See id.* at 2473-74.  Trump Br. at 10.

elements that involved speaking, related to any "constitutional [or] statutory authority" of the president, 457 U.S. at 757, was "a functionally mandated incident of the President's unique office," *id.* at 749, or preserved the separation of powers in which the immunity is "rooted" *id*. All kinds of things presidents "ordinarily do," like making a snack or helping their kids with college applications, obviously fall outside the outer perimeter of the president's official responsibilities under these *Nixon*-directed inquiries. The same goes for Trump's role in the January 6 attack: presidents are excluded by both the Constitution and the Electoral Count Act from interfering with the electoral vote count, because doing so would threaten both the legitimacy of the presidency and the separation of powers.[9] Thus, Trump's statements at the rally were not an exercise of the president's constitutionally assigned responsibilities, as the district court correctly held.

2.    Trump's "Speech on Matters of Public Concern" Test Would Create Boundless Presidential Immunity

Trump's "speech on matters of public concern" test does not merely ignore *Nixon* and *Clinton*, it directly contravenes their rejection of an unlimited, identity-based presidential immunity. In *Clinton*, the Supreme Court made clear that presidential immunity does not attach to every presidential statement and action;

---

[9] Even assuming Trump were correct that *Nixon* drew a line between actions a president "ordinarily" does or does not engage in, it is not clear how that would benefit him, as presidents do not ordinarily obstruct the count of Electoral College votes.

rather, immunity is "grounded in the nature of the function performed, not the identity of the actor who performed it." *Clinton*, 520 U.S. at 695 (cleaned up). The *Clinton* Court rejected then-President Clinton's limited claim that he could not be subject to suit for unofficial acts while still in office. In doing so, it explained that courts exercising their regular jurisdiction over suits concerning presidents' unofficial acts—whether taken before or during a president's term—"poses no perceptible risk" to the separation of powers. *Id.* at 701. To that end, the Court held that a rule conferring even a temporary immunity for unofficial acts is "unsupported by precedent" and improperly "construct[s] an immunity from suit …grounded purely in the identity of [the president's] office." *Id.* at 693. *Clinton* sets a clear limit on presidential immunity: it does not shield an action, even temporarily, solely because the person who performed it "happens to be the President." *Clinton*, 520 U.S. at 701.[10]

That is fatal to Trump's test because the president's identity as the speaker—not the substance of the president's speech—is what he contends makes anything

---

[10] Trump (Br. at 13) erroneously contends that because *Clinton* concerned Clinton's conduct prior to taking office, it "sheds no light." Trump is right that *Clinton* is not particularly helpful in determining what specific acts are or are not "official" conduct—that was not in dispute in the case. But the Court's reasoning in denying President Clinton even temporary immunity for unofficial conduct does, as Plaintiffs explain, shed light on the nature of the immunity and its limits. Because Trump's claim of immunity runs afoul of that underlying reasoning and related limits, *Clinton* forecloses his claim.

he says in public "a matter of public concern."  This is so because every utterance

by a president is potentially significant news for people intrigued by the comings

and goings of the most powerful person in the world.

Grounding presidential immunity in the president's constitutionally assigned

functions, rather than his identity as president, is not just a feature of the

Constitution's structure, it is necessary to preserve it.  Trump's own arguments

prove the point.  If adopted, Trump's "speech on matters of public concern" test

would give presidents license to nullify constitutional safeguards based solely on

an immunity implied not from any specific constitutional authority, but from a

vague penumbra of political practices.  In his view, a president would enjoy

immunity if he:

- Told a mob that he would pay anyone who detained a federal judge to prevent her from entering an order detrimental to his campaign;

- Directed supporters to storm the Supreme Court to prevent it from issuing a ruling requiring him to release his tax returns; and/or

- Ordered a mob to storm Congress and detain the Chief Justice to prevent an impeachment trial.

Such conduct would all be carried out by verbal communication—*i.e.*, "speech"

per Trump's argument—and certainly would involve matters of public concern.

But to therefore characterize these examples as actions within the scope of a

president's constitutionally assigned responsibilities would destroy the Constitution's structure.[11]  Nothing would be more dangerous to the preservation of the separation of powers that presidential immunity exists to protect.  *See Nixon*, 457 U.S. at 749; *cf. In re Grand Jury Subpoenas*, 571 F.3d at1207 (Kavanaugh, J., concurring) ("[E]specially in separation of powers cases—from *Marbury v. Madison* to the present—the Supreme Court has repeatedly stressed that the precise words of the Constitution control and that courts must not relax the enduring structural protections contained in the document's text.").

Trump's "speech on a matter of public concern" test is thus fundamentally at odds with *Nixon* and *Clinton* and cannot justify immunity here.

### C.    Trump's Remaining Arguments All Fail

#### 1.    The District Court Acted Properly When It Considered Facts Relating to Trump's Conduct

Trump's central argument (Br. at 14) for why courts should invent a "speech on matters of public concern" test is that the test supposedly allows courts to avoid "undertaking a fact-intensive inquiry," such as "[e]xamining the contents of a

---

[11] Trump (Br. at 20-22) tries to analogize his conduct on January 6 to President Biden's criticism of the Supreme Court's *Dobbs* decision in June 2022 and the threats by private citizens later that month against Justice Kavanaugh in his home for his vote in that case.  Trump compares apples to oranges.  President Biden did not stage a rally for armed extremists (using campaign funds) down the street from Justice Kavanaugh's home.  Nor did he, at such a rally, urge the crowd to "play by very different rules" and "fight like hell," or join him in marching to Justice Kavanaugh's home.

tweet or speech." Such an inquiry, he contends, is "forbidden by [*Nixon*]." Not so.

To start, *Nixon* does not prohibit fact-intensive judicial inquiries; it instead prohibits interrogations of presidential *motive*—in that case, whether Nixon was motivated by revenge to fire a whistleblower. The *Nixon* Court *did* consider the relevant facts and circumstances—including the fact that the fired employee was an Air Force officer and not, say, an employee of a Nixon-family-operated business—to determine whether Nixon was exercising presidential power. *Nixon*, 457 U.S. at 756. That is what the district court likewise did when it analyzed Trump's statements to determine whether they served any function of the presidency.

In any event, Trump's argument on this score simply makes clear that he is seeking blanket immunity. Insofar as a "public concern" analysis would avoid judicial scrutiny of the content of a tweet or speech, it would do so on the theory that everything a president says is a matter of public concern, and therefore within the outer perimeter of a president's responsibilities. If, however, the analysis does impose some meaningful limit on immunity (as required by *Nixon* and *Clinton*), courts would then be called upon to consider whether the substance of communications, in fact, relate to a "matter of public concern." Trump cannot have it both ways: Either he is seeking an impermissible blanket immunity, or he is

inviting the precise kind of fact-intensive judicial scrutiny and line-drawing inquiries that he decries.

At bottom, Trump's complaint is that the district court's analysis necessitates some amount of line drawing by courts. But that is inevitable given the standard set forth in *Nixon*. Because presidential immunity is derived from the president's official functions, and not his identity as president, *see Clinton*, 520 U.S. at 695, determining whether a president was carrying out an official function is inherent in the immunity inquiry. Accordingly, *Nixon* contemplates that "lines" must be "drawn" and cautions only that those lines be derived from the structure of the president's unique office and not "finer than history and reason would support." *Nixon*, 457 U.S. at 755. And *Nixon* ensured breathing room for the presidency amidst this line drawing by conferring immunity for all acts within the "outer perimeter" of the president's official responsibilities. *See id.* at 756. By considering the relationship between Trump's words and the functions of the presidency—as defined by the Constitution and statutory law—the district court drew lines in precisely the manner that *Nixon* and *Clinton* require.

> 2.  The District Court Did Not Improperly Consider Trump's Motives in Denying his Immunity Claims

Trump's next argument, that the district court improperly considered his "motives" as part of its immunity analysis, misreads both *Nixon* and the district court's order. In *Nixon*, the Supreme Court rejected the argument that President

Nixon's allegedly retaliatory motive for firing Fitzgerald transformed the firing from a mere reduction in executive branch staff—an exercise of presidential authority expressly granted by statute—into a retaliatory firing prohibited by statute and thus beyond the scope of the president's official powers. *Id.* at 756. The president's subjective motivations for taking a particular action could not, the Court explained, transform otherwise official acts into personal ones. *Id.* Any other rule would subject presidents to "an inquiry into the President's motives" that would be "highly intrusive." *Id.*

Consistent with this directive from *Nixon*, the district court's analysis in this case never probed Trump's subjective state of mind. Nor does its finding that Trump was not exercising presidential powers when he took steps to block the timely completion of the electoral vote count hinge on whether Trump thought he was justified in urging the mob to attack the Capitol because he honestly believed the 2020 election was stolen. Rather, just as in *Nixon*, the district court analyzed the relevant "act," not Trump's reason for acting. Just as *Nixon* considered that Fitzgerald was a member of the Air Force (and not, for example, an employee of a Nixon family business), the district court considered the context for Trump's conduct, the nature of the institution that Trump directed the mob to attack, and the constitutional and statutory role of that institution. And just as the *Nixon* Court found that Nixon's direction that Fitzgerald be fired was an exercise of his power

to reduce the size of the Air Force, the district court found that Trump's direction that a mob of his political supporters storm the Capitol to stop Congress's count of electoral votes was not an exercise of any presidential power.  Nothing about that inquiry involves Trump's subjective motivations.[12]

In short, Trump is wrong that *Nixon's* rejection of a motive inquiry shields him from liability.

### 3.    Trump Wrongly Conflates Westfall Act Immunity with Presidential Immunity

Trump contends that his conduct, as described in the complaints, must serve a presidential function because: (1) a member of Congress or an executive branch employee who engaged in the same conduct would be within the scope of her employment (and therefore immune from suit) under the Westfall Act; and (2) immunity under "the Westfall Act is narrower than … presidential immunity." Trump Br. at 24-25.  Both prongs of this argument are flawed.

First, there is no basis to believe that a member of Congress or an executive branch official engaged in the same conduct as Trump would be immune under the Westfall Act.  When Representative Mo Brooks, a member of Congress, attempted

---

[12] Indeed, the only party focusing on motives in the immunity analysis is Trump, when he makes the procedurally improper (at the motion to dismiss stage) suggestion (Trump Br. at 4) that he merely "engaged in open discussion and debate about the integrity of the 2020 election."  By claiming his conduct is immune because he was motivated by an earnest belief that the election had been stolen, he asks this Court to engage in an impermissible motive inquiry of its own.

to invoke the protections of the Westfall Act for his statements at the Save America rally on January 6 (which were similar to Trump's), the Department of Justice correctly determined that his actions were *not* within the scope of his employment because they were both private campaign activity and an incitement of an attack on Congress. *See* Brief of the Department of Justice, No. 21-cv-586 (ECF No. 33) at 13-14.[13] More specifically, the Justice Department observed that "[e]ngag[ing] in a conspiracy and incit[ing] the attack on the Capitol on January 6 … plainly would not qualify as within the scope of employment for an officer or employee of the United States" *Id.* at 8.

Second, and more fundamentally, nothing in the Westfall Act or the doctrine of presidential immunity suggests that one source of immunity is necessarily broader or narrower than the other. They are simply different.

The Westfall Act creates absolute immunity for some federal officials who commit torts within the scope of their employment. To determine what conduct falls within an official's scope of employment and thus whether this immunity is applicable, "courts apply the *respondeat superior* law in the state in which the alleged tort occurred." *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006). *Nixon*, by contrast, requires courts to determine the scope of

---

[13] The House of Representatives declined Westfall certification on the same grounds. *Supra* at 14 n.3.

a president's official duties not by reference to a given state's law of *respondeat superior*, but from our federal "constitutional heritage and structure." *Nixon*, 457 U.S. at 748.

The analysis in each of the cases on which Trump relies shows the mismatch between the Westfall Act and presidential immunity and rebuts any assertion that Westfall Act immunity is, in all cases, narrower than the "outer perimeter test." For example, in Ballenger this Court explained that, under *respondeat superior* principles, an official's motive is highly relevant because "even a *partial* desire to serve [a] master is sufficient" to place a particular course of conduct within the scope of an official's employment. 444 F.3d at 665 (citing Restatement (Second) of Agency § 228(1)(c)) (emphasis original). Both *Wuterich v. Murtha*, 562 F.3d 375, 377, 384-85 (D.C. Cir. 2009), and *Wilson v Libby*, 535 F.3d 697, 712 (D.C. Cir. 2008), the two other cases Trump invokes (Br. at 24-25), also apply the motive-inclusive test from *Ballenger*. But, consistent with Trump's own arguments, a test that makes *motive alone* sufficient to confer immunity will yield quite different results from one that expressly prohibits motive inquiries.[14]  *See Nixon*, 457 U.S. at 756.

---

[14] As further evidence that Westfall Act immunity protects more conduct than presidential immunity, *any* intentional use of force by a defendant is considered to be within the scope of his duties. *Ballenger*, 444 F.3d at 663 (quoting Restatement (Second) of Agency § 228 (1958)).

## III.    PRUDENTIAL CONSIDERATIONS COUNSEL AGAINST GRANTING TRUMP IMMUNITY

In a last-ditch effort to shield himself with immunity, Trump argues that his impeachment and acquittal counsel in favor of immunity.  Trump Br. at 26-27.  Specifically, Trump appears to argue that because impeachment is the only available remedy for a president's official acts, and he was, in fact, impeached (and acquitted) for his role in events of January 6, that means his conduct was official or otherwise immune.  *Id.*

Insofar as Trump is suggesting that impeachment is not available for *private* acts, that is absurd.  In explaining why impeachment must be available to address unofficial acts, Justice Story used the example of an official who, like Trump, "[a]ided insurgents in a mediated conspiracy or insurrection against the government."  2 J. Story, Commentaries on the Constitution of the United States § 802 (1833).  Such acts were, in Justice Story's view, indisputably unofficial, yet it was essential that impeachment be available in order to swiftly remove from office a participant in an armed insurrection.  *Id.*  To the extent Trump instead means to argue that Plaintiffs are estopped from pursuing their claims because he was acquitted at his impeachment trial, that is both a misapplication of estoppel principles, *see* Restatement (Second) of Judgments § 28 (1982), and beyond the scope of this appeal, which is limited only to the issue of presidential immunity.

50

Trump's broader point—that there are prudential considerations counseling in favor of immunity—is also incorrect. In *Nixon*, the Court identified the availability of political accountability and concerns about opening the floodgates of litigation as prudential justifications supporting immunity. *See Nixon*, 457 U.S. at 757. But when a president interferes with the count of electoral votes, this ordinary set of prudential considerations favoring immunity instead counsel against it. To start, the timing of any presidential interference in the electoral count necessarily cuts off most other forms of accountability. By January 6, the incumbent president's term is nearly over (Trump expressly argued for acquittal in his case because he was no longer in office at the time of trial and numerous Senators justified their votes for acquittal on precisely this ground).[15] Accordingly, the "threat of impeachment" offers few tangible consequences, as it would cut short the presidential term by at most a few weeks. *See id.* Congress's "vigilant

---

[15] 167 Cong. Rec. S731-32. Thirty-eight senators raised jurisdiction-based objections, enough to acquit Mr. Trump. *See* Ryan Goodman and Josh Asabor, *In Their Own Words: The 43 Republicans' Explanations of their Votes Not to Convict Trump in Impeachment Trial*, Just Security (Feb. 15, 2021), https://www.justsecurity.org/74725/in-their-own-words-the-43-republicans-explanations-of-their-votes-not-to-convict-trump-in-impeachment-trial (cataloguing twenty-two Senators with jurisdiction-based objections and an additional sixteen with jurisdiction- and merits-based objections). Following Trump's arguments to their logical conclusion, there would be a period of time after an incumbent loses reelection when effectively he would be above the law because no impeachment trial could occur before his term ended and thereafter, he would be immune for any act for which he could have been impeached. This cannot be correct.

oversight" is equally ineffective in the waning days of a president's term.  *See id.*  And because the election has already happened, any "desire to earn reelection" cannot act as a meaningful "incentive[] to avoid misconduct."

Nor would denying immunity for this narrow band of conduct open the floodgates of litigation.  The count of electoral votes happens only once in a president's term and only on a single day.  And interference with that process could cause legally cognizable injuries only to a small set of persons: the candidates and, in the case of a physical attack on that process, those physically present.  Denying immunity here would therefore not open the president to suits from "countless people."  *Id.* at 753.  Further, given the fragility of the constitutional order as Congress counts electoral votes and the potential that an incumbent president will be a uniquely partial actor with respect to that process, interference with the electoral vote count is not a context in which there "exists the greatest public interest in providing [the president] the maximum ability" to act "fearlessly."  *Id*. at 752 (internal quotations marks omitted).  Accordingly, the various prudential factors the Supreme Court considered in *Nixon* all counsel against immunity here.

## **CONCLUSION**

The district court's denial of absolute immunity should be affirmed.

Dated:  September 23, 2022                    Respectfully submitted,

*/s/ Joseph M. Sellers*                       Janette McCarthy-Wallace Bar No.
Joseph M. Sellers, D.C. Cir. Bar No.          OH066257
30022                                         Anthony P. Ashton, Bar No. MD25220
Brian Corman, Bar No. DC1008635               Anna Kathryn Barnes, Bar No. 63609
Alison S. Deich, Bar No. DC1572878            NAACP
COHEN MILSTEIN SELLERS &                      Office of General Counsel
TOLL PLLC                                     4805 Mount Hope Drive
1100 New York Avenue, N.W. Fifth              Baltimore, MD 21215
Floor Washington, DC 20005                    Telephone: (410) 580-5777
Telephone: (202) 408-4600                     jlouard@naacpnet.org
Facsimile: (202) 408-4699                     aashton@naacpnet.org
jsellers@cohenmilstein.com                    abarnes@naacpnet.org
bcorman@cohenmilstein.com
adeich@cohenmilstein.com

Robert B. McDuff
MISSISSIPPI CENTER FOR
JUSTICE
767 North Congress Street
Jackson, MS 39202
601-259-8484

*Attorneys for Appellees Hon. Bennie G.*
*Thompson, et al.*

Philip Andonian (Bar No. 63669)              Matthew Kaiser (Bar No. 5303)
Joseph Caleb (D.C. Bar No. 495383)           Sarah R. Fink (Bar No. 63849)
CALEBANDONIAN PLLC                           KAISERDILLON PLLC
1100 H Street, N.W., Ste. 315                1099 Fourteenth Street, N.W., 8th
Washington, D.C. 20005                       Fl.West
Tel: (202) 953-9850                          Washington, D.C. 20005
phil@calebandonian.com                       Tel: (202) 640-2850
joe@calebandonian.com                        mkaiser@kaiserdillon.com
                                             sfink@kaiserdillon.com

*Attorneys for Appellee Eric Swalwell*

Patrick A. Malone (Bar No. 397142)
Daniel Scialpi (Bar No. 997556)
Heather J. Kelly (Bar No. 453154)
PATRICK MALONE &
ASSOCIATES, P.C.
1310 L Street, N.W., Suite 800
Washington, D.C. 20005
P: 202-742-1500
F: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com
hkelly@patrickmalonelaw.com

Cameron Kistler (Bar No. 62145)
Erica Newland (Bar No. pending)
Kristy Parker (Bar No. 63922)
Jacek Pruski
Anne Tindall
Helen E. White (Bar No. pending)
UNITED TO PROTECT
DEMOCRACY
2020 Pennsylvania Ave. NW, #163
Washington, D.C. 20006
P: 202-579-4582
cameron.kistler@protectdemocracy.org
erica.newland@protectdemocracy.org
kristy.parker@protectdemocracy.org
jacek.pruski@protectdemocracy.org
anne.tindall@protectdemocracy.org
helen.white@protectdemocracy.org

John Paredes
UNITED TO PROTECT
DEMOCRACY
115 Broadway, 5th Floor
New York, N.Y. 10006
P: 202-579-4582
john.paredes@protectdemocracy.org

*Attorneys for Appellees James
Blassingame and Sidney Hemby*

Genevieve C. Nadeau (Bar No. 63685)
Benjamin L. Berwick (Bar No. 62300)
UNITED TO PROTECT
DEMOCRACY
15 Main St., Suite 312
Watertown, MA 02472
P: 202-579-4582
genevieve.nadeau@protectdemocracy.
org
benjamin.berwick@protectdemocracy.
org

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I hereby certify as follows:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,478 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii);

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Times New Roman font.

Dated: September 23, 2022                    */s/ Joseph M. Sellers*
                                            Joseph M. Sellers

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2022, I electronically filed the foregoing document with the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Joseph M. Sellers*
Joseph M. Sellers

# ADDENDUM

# PERTINENT STATUES AND AUTHORITIES

**U.S. Constitution, Article I, Section 6, Clauses 1 & 2**

The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

. . . .

No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.

**U.S. Constitution, Article I, Section 1, Clauses 2 & 4**

Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

. . . .

The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.

**U.S. Constitution, Article II, Section 3, Clause 5**

He shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; he may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper; he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

**U.S. Constitution, Amendment XII**

The Electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;–the President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted;–The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President.  But in choosing the President, the votes shall be taken by states, the representation from each state having one vote; a quorum for this purpose shall consist of a member or members from two-thirds of the states, and a majority of all the states shall be necessary to a choice.  [And if the House of Representatives shall not choose a President whenever the right of choice shall devolve upon them, before the fourth day of March next following, then the Vice-President shall act as President, as in case of the death or other constitutional disability of the President. –]The person having the greatest number of votes as Vice-President, shall be the Vice-President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice-President; a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice.  But no person constitutionally ineligible to the office of President shall be eligible to that of Vice-President of the United States.

**3 U.S.C. § 15**

Congress shall be in session on the sixth day of January succeeding every meeting of the electors.  The Senate and House of Representatives shall meet in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and the President of the Senate shall be their presiding officer.  Two tellers shall be previously appointed on the part of the Senate and two on the part of the House of Representatives, to whom shall be handed, as they are opened by the President of the Senate, all the certificates and papers purporting to be certificates of the electoral votes, which certificates and papers shall be opened,

presented, and acted upon in the alphabetical order of the States, beginning with
the letter A; and said tellers, having then read the same in the presence and hearing
of the two Houses, shall make a list of the votes as they shall appear from the said
certificates; and the votes having been ascertained and counted according to the
rules in this subchapter provided, the result of the same shall be delivered to the
President of the Senate, who shall thereupon announce the state of the vote, which
announcement shall be deemed a sufficient declaration of the persons, if any,
elected President and Vice President of the United States, and, together with a list
of the votes, be entered on the Journals of the two Houses.  Upon such reading of
any such certificate or paper, the President of the Senate shall call for objections, if
any.  Every objection shall be made in writing, and shall state clearly and
concisely, and without argument, the ground thereof, and shall be signed by at least
one Senator and one Member of the House of Representatives before the same
shall be received.  When all objections so made to any vote or paper from
a State shall have been received and read, the Senate shall thereupon withdraw, and
such objections shall be submitted to the Senate for its decision; and the Speaker of
the House of Representatives shall, in like manner, submit such objections to
the House of Representatives for its decision; and no electoral vote or votes from
any State which shall have been regularly given by electors whose appointment has
been lawfully certified to according to section 6 of this title from which but one
return has been received shall be rejected, but the two Houses concurrently may
reject the vote or votes when they agree that such vote or votes have not been so
regularly given by electors whose appointment has been so certified.  If more than
one return or paper purporting to be a return from a State shall have been received
by the President of the Senate, those votes, and those only, shall be counted which
shall have been regularly given by the electors who are shown by the determination
mentioned in section 5 of this title to have been appointed, if the determination in
said section provided for shall have been made, or by such successors or
substitutes, in case of a vacancy in the board of electors so ascertained, as have
been appointed to fill such vacancy in the mode provided by the laws of
the State; but in case there shall arise the question which of two or more of
such State authorities determining what electors have been appointed, as
mentioned in section 5 of this title, is the lawful tribunal of such State, the votes
regularly given of those electors, and those only, of such State shall be counted
whose title as electors the two Houses, acting separately, shall concurrently decide
is supported by the decision of such State so authorized by its law; and in such case
of more than one return or paper purporting to be a return from a State, if there
shall have been no such determination of the question in the State aforesaid, then
those votes, and those only, shall be counted which the two Houses shall
concurrently decide were cast by lawful electors appointed in accordance with the

laws of the State, unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State.  But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the executive of the State, under the seal thereof, shall be counted.  When the two Houses have voted, they shall immediately again meet, and the presiding officer shall then announce the decision of the questions submitted.  No votes or papers from any other State shall be acted upon until the objections previously made to the votes or papers from any State shall have been finally disposed of.

**3 U.S.C. § 16**

At such joint meeting of the two Houses seats shall be provided as follows: For the President of the Senate, the Speaker's chair; for the Speaker, immediately upon his left; the Senators, in the body of the Hall upon the right of the presiding officer; for the Representatives, in the body of the Hall not provided for the Senators; for the tellers, Secretary of the Senate, and Clerk of the House of Representatives, at the Clerk's desk; for the other officers of the two Houses, in front of the Clerk's desk and upon each side of the Speaker's platform.  Such joint meeting shall not be dissolved until the count of electoral votes shall be completed and the result declared; and no recess shall be taken unless a question shall have arisen in regard to counting any such votes, or otherwise under this subchapter, in which case it shall be competent for either House, acting separately, in the manner hereinbefore provided, to direct a recess of such House not beyond the next calendar day, Sunday excepted, at the hour of 10 o'clock in the forenoon.  But if the counting of the electoral votes and the declaration of the result shall not have been completed before the fifth calendar day next after such first meeting of the two Houses, no further or other recess shall be taken by either House.

**3 U.S.C. § 17**

When the two Houses separate to decide upon an objection that may have been made to the counting of any electoral vote or votes from any State, or other question arising in the matter, each Senator and Representative may speak to such objection or question five minutes, and not more than once; but after such debate shall have lasted two hours it shall be the duty of the presiding officer of each House to put the main question without further debate.

**3 U.S.C. § 18**

While the two Houses shall be in meeting as provided in this chapter, the President of the Senate shall have power to preserve order; and no debate shall be

allowed and no question shall be put by the presiding officer except to either House on a motion to withdraw.

**42 U.S.C § 1985**

(1) Preventing Officer From Performing Duties: If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

. . . .

(3) . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.