**[ORAL ARGUMENT HELD DECEMBER 7, 2022]**

**Nos. 22-5069, 22-7030, 22-7031**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

JAMES BLASSINGAME *et al.*,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP,

Defendant-Appellant.

————————————

On Appeal from the United States District Court
for the District of Columbia

————————————

**BRIEF FOR UNITED STATES AS AMICUS CURIAE**

————————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

MARK R. FREEMAN
MARK B. STERN
JOSHUA M. SALZMAN
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Plaintiffs in district court, and appellees here, in these consolidated cases are James Blassingame, Sidney Hemby, Karen R. Bass, Stephen I. Cohen, Veronica Escobar, Pramila Jayapal, Henry C. Johnson Jr., Marcia C. Kaptur, Barbara J. Lee, Jerrold Nadler, Maxine Waters, Bonnie M. Watson Coleman, and Eric Swalwell.  Bennie G. Thompson was formerly a plaintiff in district court, but he has since voluntarily dismissed his claim with prejudice.

Defendant in district court, and appellant here, is Donald J. Trump. Additional defendants in district court who are not appellants here include Donald J. Trump Jr., Enrique Tarrio, Morris Brooks Jr., the Oath Keepers, Proud Boys International LLC, Rudolph W. Giuliani, and Warboys LLC.

Non-party respondents in district court were the Office of General Counsel for the United States House of Representatives and the United States of America.

Amici in district court, and in this Court, are Evan H. Caminker, Andrew Kent, Sheldon Nahmod, Daphna Renan, Peter M. Shane, and Jared Holt.  Amici in this Court, though not in district court, are Vicki C. Jackson,

Daniel B. Baer, James Arden Barnett Jr., Paul L. Boyd, Steven A Browning, Dwight L. Bush Sr., Judith Cefkin, Akunna E. Cook, Greg Craig, Glyn T. Davies, Greg Delawie, William C. Echo, John Feeley, Mark Feierstein, Robert S. Gelbard, Ken Gross, Keith M. Harper, Bruce Alan Heyman, Karl Hofmann, Vicki J. Huddleston, Dennis C. Jett, C. Donald Johnson, Laura E. Kennedy, Anthony Lake, Hugo Llorens, Carmen Lomellin, Lewis Lukens, David McKean, James D. Melville Jr., Thomas Pickering, Steven Pifer, Randy Manner, Stephen D. Mull, Thomas B. Robertson, Theodore Sedgwick, Cliff Sloan, Alan D. Solomont, Karen Clark Stanton, M. Arsalan Suleman, Kevin Whitaker, Pamela White, Donald B. Ayer, John B. Bellinger III, Matthew Collette, Charles Fried, Stuart M. Gerson, Mary B. McCord, David O'neil, Alan Charles Raul, Matthew D. Roberts, Robert B. Shanks, Kate Shaw, Olivia Troye, and the United States of America.  Amici in district court, though not in this Court, are Campaign Legal Center, Floyd Abrams, Erwin Chemerinsky, Martha Minow, and Laurence H. Tribe.

### B.    Rulings Under Review

The rulings under review are the opinion and order entered on February 18, 2022, *see Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. 2022) (Mehta, J.).

## C.    Related Cases

The consolidated cases on review have not previously been before this Court or any other, save the district court from which they originated. The undersigned counsel is aware of five other pending cases involved similar issues and at least some overlapping parties currently pending, four in this Court and one in the district court: *Moore v. Trump*, No. 22-7120 (D.C. Cir.); *Tabron v. Trump*, No. 22-7121 (D.C. Cir.); *Kirkland v. Trump*, No. 22-7122 (D.C. Cir.); *Smith v. Trump*, No. 23-7010 (D.C. Cir.); and *Garza v. Trump*, No. 1:23-cv-38 (D.D.C.). The undersigned counsel is not aware of any additional related cases pending in this Court or any other.

*/s/ Sean R. Janda*
Sean R. Janda

## TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ..................................................................... 1

STATEMENT .......................................................................... 4

ARGUMENT .......................................................................... 7

I.   The Absolute Immunity of the President Encompasses All
     Conduct Within the Scope of the President's Office ............................. 7

     A.   The President is immune from civil damages claims
          for all conduct within the outer perimeter of his Office ................ 8

     B.   The district court correctly declined to adopt categorical
          limitations on the President's immunity .................................... 10

II.  Incitement of Imminent Private Violence Is Not Within the Outer
     Perimeter of the President's Office ....................................... 15

CONCLUSION ...................................................................... 23

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                                    <u>Page(s)</u>

*Brandenburg v. Ohio*,
   395 U.S. 444 (1969) ............................................................................. 7, 17

*Council on Am. Islamic Relations v. Ballenger*,
   444 F.3d 659 (D.C. Cir. 2006) ............................................................... 12

*Hess v. Indiana*,
   414 U.S. 105 (1973) .............................................................................. 18

*Lindsey, In re*,
   158 F.3d 1263 (D.C. Cir. 1998) ......................................................... 2, 13

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982) .............................................................................. 18

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ........................ 1, 3, 4, 7, 8, 9, 10, 14, 15, 16, 17, 18, 19

*NLRB v. Noel Canning*,
   573 U.S. 513 (2014) .............................................................................. 11

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ..................................................................... 11, 16

*Trump v. Mazars USA, LLP*,
   140 S. Ct. 2019 (2020) ...................................................................... 8, 13

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................................ 8

**U.S. Constitution:**

Art. II, §§ 2-3 ............................................................................................ 8

**Statutes:**

28 U.S.C. § 2679 ....................................................................................... 14

42 U.S.C. § 1985(1)  ...................................................................  3, 4

42 U.S.C. § 1986  ..........................................................................  6

**Other Authority:**

*Payment of Expenses Associated with Travel by the President and
    Vice President*, 6 OLC Op. 214 (1982) .........................................................  21

**GLOSSARY**

JA                              Joint Appendix

## INTRODUCTION

In these suits, Members of Congress and Capitol Police officers have brought civil damages claims against former President Trump arising from injuries they sustained during the assault on the Capitol on January 6, 2021. The United States respectfully responds to this Court's request for its views regarding the former President's assertion of absolute immunity.

To ensure that the President has the "maximum ability to deal fearlessly and impartially with the duties of his office," the Supreme Court has held that the President must possess "absolute immunity from damages liability predicated on his official acts." *Nixon v. Fitzgerald*, 457 U.S. 731, 749, 752 (1982) (quotation omitted). That immunity reaches all of the President's conduct within the vast ambit of his Office, including its "innumerable" constitutional, statutory, and historical dimensions. *Id*. at 750, 756. In many traditional spheres of Presidential action, the President's responsibilities under Article II are extraordinary and far-reaching, and damages claims predicated on conduct beyond the "outer perimeter," *id.* at 756, of those responsibilities are difficult to imagine. In other contexts—such as when a President acts in his capacity as a candidate for reelection in a distinct campaign setting—that outer perimeter may be closer at hand. Even then, however, "[b]ecause the Presidency is tied so tightly to the persona of its occupant," "the line between

official and personal" is "both elusive and difficult to discern." *In re Lindsey*, 158 F.3d 1263, 1286 (D.C. Cir. 1998) (per curiam) (Tatel, J., concurring in part and dissenting in part). In all contexts, questions of presidential immunity must be approached with the greatest sensitivity to the unremitting demands of the Presidency.

Nevertheless, although courts should be reluctant to conclude that a suit against the President is based on conduct that lies beyond the outer perimeter of his Office, the United States agrees with the district court that a meaningful perimeter exists. *Nixon v. Fitzgerald* establishes a rule of absolute immunity for the President's official acts. It is not a rule of absolute immunity for the President regardless of the nature of his acts.

Here, the district court concluded that plaintiffs' complaints plausibly allege that President Trump's speech at the rally on January 6, 2021, precipitated the ensuing attack on the Capitol—and, in particular, that the complaints plausibly allege that the former President's speech encouraged imminent private violent action and was likely to produce such action. The United States expresses no view on that conclusion, or on the truth of the allegations in plaintiffs' complaints. But in the United States' view, such incitement of imminent private violence would not be within the outer perimeter of the Office of the President of the United States.

2

In this Court, President Trump has not challenged the district court's conclusion—reiterated by plaintiffs on appeal—that the complaints plausibly allege that his speech instigated the attack on the Capitol.  Instead, his briefs advance only a single, categorical argument:  A President is always immune from any civil suits based on his "speech on matters of public concern," Trump Br. 7—even if that speech also constitutes incitement to imminent private violence.  The United States respectfully submits that the Court should reject that categorical argument.  And because that is the only argument the former President has pressed on appeal, the Court could affirm the district court's order on that narrow ground without attempting to comprehensively define the boundaries of the President's immunity for his speech on matters of public concern—including when and how to draw a line between the President's official and electoral speech.  Those are sensitive questions of fundamental importance to the Executive Branch, and this unusual case would be a poor vehicle for resolving them.[1]

---

[1] The absolute immunity at issue in this appeal concerns only a President's liability in a "private suit for damages." *Nixon*, 457 U.S. at 754.  In addressing that question, the United States does not express any view regarding the potential criminal liability of any person for the events of January 6, 2021, or acts connected with those events.  The government also expresses no view on any other issue decided by the district court, including whether plaintiffs have stated a valid claim for relief under 42 U.S.C. § 1985(1) or any other cause of action.

3

## STATEMENT

1.  Following the events of January 6, 2021, these lawsuits were filed by Members of the House of Representatives and two Capitol Police officers.  As relevant here, each plaintiff brought a claim against former President Trump under 42 U.S.C. § 1985(1), which prohibits conspiring to impede officers of the United States in the discharge of their duties or to prevent any person from accepting a federal office.  Some plaintiffs also asserted other claims against former President Trump, including claims under District of Columbia law.  *See* JA 214-16.

Plaintiffs' central theory is that the former President and other defendants "conspired to prevent members of Congress, by force, intimidation, and threats, from discharging their duties in connection with the Certification of the Electoral College."  JA 205.  Plaintiffs' allegations against President Trump focus on his public statements following the November 2020 election and, in particular, on his speech at a rally on the Ellipse on January 6, 2021.  Plaintiffs allege that President Trump's speech "incited his supporters to commit imminent acts of violence and lawlessness at the Capitol."  *Id.*

2.  President Trump moved to dismiss the claims against him, contending (as relevant here) that he is entitled to absolute immunity under *Nixon v. Fitzgerald*, 457 U.S. 731 (1982).  He argued, in particular, that the

4

primary acts for which plaintiffs sought to impose civil liability—his pre-January 6 statements and his speech at the January 6 rally—fell within the outer limits of two presidential functions:  (1) the President's constitutional responsibility to take care that the laws are faithfully executed and (2) the historical function of the Office of the President as a "bully pulpit" to address and rally the public on matters of public concern.  *See* JA 228-29.  The district court rejected both arguments in relevant part.

First, the court concluded that President Trump's challenged actions did not fall within his Take Care Clause duties because they were directed at the implementation of constitutional and statutory provisions that do not prescribe a role for the President and are instead carried out by officials in state governments and in Congress.  JA 229-32.

Second, the district court concluded that the former President's actions did not fall within the President's traditional function of addressing the public on matters of public concern.  The court recognized that "speech is unquestionably a critical function of the presidency."  JA 233.  It likewise agreed that President Trump's statements and speech "addressed matters of public concern:  the outcome of the 2020 Presidential Election and election integrity."  *Id.*  But the court rejected the former President's categorical

5

argument "that whenever and wherever a President speaks on a matter of public concern he is immune from civil suit." JA 234.

In particular, the district court concluded that speech undertaken as part of a President's efforts to "secure or perpetuate incumbency" falls outside a President's duties because the "Office of the President has no preference for who occupies it." JA 238. Here, the court determined that the former President's challenged statements, including his January 6 speech, "reflect[ed] an electoral purpose, not speech in furtherance of any official duty." JA 241. The court stated, for example, that the "main thrust" of the speech was to assert that "perceived cases of election fraud" had "led President-elect Biden to win more votes in closely contested states," "to urge members of Congress to object to certain state certifications," and "to exhort the Vice President to return those certifications to those states to be recertified." JA 240.[2]

After concluding that President Trump was not entitled to absolute immunity for the bulk of the claims asserted against him, the district court rejected other arguments in support of his motion to dismiss. As relevant here, the district court held that the former President's January 6 speech was not

---

[2] The district court upheld President's Trump's assertion of immunity as to a claim that he violated 42 U.S.C. § 1986 by failing to take action to halt the attack on the Capitol. JA 241-42. The court explained that the President cannot be held liable for an alleged "failure to exercise his presidential powers." JA 242.

protected by the First Amendment because plaintiffs had adequately alleged that it constituted incitement to violence. Under *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam), speech falls outside the First Amendment if it "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447; *see* JA 286. The court acknowledged that "*Brandenburg*'s imminence requirement is stringent," but it held that plaintiffs' complaints had plausibly alleged that the former President's speech was "an implicit call for imminent violence or lawlessness" and was likely to produce a violent response from the assembled crowd. JA 297-98.

3. Former President Trump appealed the district court's order denying absolute immunity. On December 20, 2022, following briefing and oral argument, this Court invited the Department of Justice to file an amicus brief expressing the views of the United States.

## ARGUMENT

## III.    The Absolute Immunity of the President Encompasses All Conduct Within the Scope of the President's Office

To protect the autonomy and independence of the Presidency, the Supreme Court has recognized that the President must possess "absolute immunity from damages liability predicated on his official acts." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982). That immunity extends to all Presidential conduct falling within the "innumerable" constitutional, statutory, and

historical dimensions of his Office. *Id.* at 750, 756. The district court correctly refused to curtail that immunity in the categorical ways that plaintiffs propose.

**A.    The President is immune from civil damages claims for all conduct within the outer perimeter of his Office**

"The President occupies a unique position in the constitutional scheme." *Nixon*, 457 U.S. at 749. The Constitution vests the legislative and judicial powers in a plural Congress and plural Judiciary. But it vests the entirety of the executive power "in a single head in whose choice the whole Nation has a part, making him the focus of public hopes and expectations." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring). The Constitution entrusts the President with vast and unremitting public responsibilities, including taking care that the laws are faithfully executed; commanding the Armed Forces; nominating, appointing, and removing officers; making treaties; recommending, signing, and vetoing bills; sending and receiving ambassadors; and granting pardons and reprieves. U.S. Const. art. II, §§ 2-3. And as "the only person who alone composes a branch of government," *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020), the President is called upon to speak and act not just for a single district or State, but for all the people of the United States.

"[T]he sheer prominence of the President's office" makes him "an easily identifiable target for suits for civil damages." *Nixon*, 457 U.S. at 752-53. In

8

the conduct of his official responsibilities, "a President must concern himself with matters likely to arouse the most intense feelings." *Id.* (quotation omitted). Yet as the Supreme Court has emphasized, it is precisely in such circumstances that there is "the greatest public interest in providing" the President with "the maximum ability to deal fearlessly and impartially with the duties of his office." *Id.* (quotation omitted). To require the President to face private damages suits for actions associated with his Office and role would threaten to make the President "unduly cautious in the discharge of his official duties." *Id.* at 752 n.32.

Accordingly, "[i]n view of the special nature of the President's constitutional office and functions," the Supreme Court has determined that it is "appropriate to recognize absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility." *Nixon*, 457 U.S. at 756. This immunity, the Supreme Court has explained, may not be curtailed by attempting to parse discrete Presidential "functions," or through allegations that official acts were taken with improper motives. Because the President has "discretionary responsibilities in a broad variety of areas, . . . [i]n many cases it would be difficult to determine which of the President's innumerable 'functions' encompassed a particular action." *Id.* And "an inquiry into the President's motives" to determine whether a

9

particular action was done in furtherance of a legitimate function or for

nefarious reasons would "be highly intrusive" and would impermissibly

"subject the President to trial on virtually every allegation that an action was

unlawful, or was taken for a forbidden purpose." *Id.*

## B.    The district court correctly declined to adopt categorical limitations on the President's immunity

The district court correctly declined plaintiffs' invitation to carve out

certain areas of Presidential conduct as categorically beyond the outer limits of

the President's Office.

*First*, the district court correctly declined to embrace plaintiffs' suggestion

that presidential speech or conduct necessarily falls beyond the outer perimeter

of the President's Office if it concerns functions that the Constitution assigns

exclusively to another Branch.  Plaintiffs renew that contention in this Court,

urging that any conduct by the President concerning the certification of

presidential election results necessarily falls outside the immunity recognized

in *Nixon* because the Constitution and relevant statutes afford the President no

role in the certification process.  *See, e.g.*, Plaintiffs Br. 26.

That categorical claim disregards the complexities of the President's role

in our constitutional system.  Although the Constitution allocates powers

among the three Branches, it also contemplates that the Branches will check

each other in the exercise of those powers.  History teaches that, in many

10

circumstances, such interbranch checks occur through officials' use of political, public, or interpersonal power, rather than through the exercise of any enumerated constitutional authority. *Cf. NLRB v. Noel Canning*, 573 U.S. 513, 555-56 (2014) ("[T]he President and Senators engage with each other in many different ways and have a variety of methods of encouraging each other to accept their points of view."). Thus, for example, a President acts within the scope of his office when he urges Members of Congress to act in a particular way with respect to a given legislative matter—even a matter, such as a congressional investigation, in which the President has no constitutional role.

That is particularly plain with respect to damages claims predicated on a President's speech to the public. "The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018). The immunity recognized in *Nixon* thus ordinarily protects the President from civil damages liability arising out of his speech to the public on matters of public concern. Plaintiffs rightly do not dispute that, for example, a President's speech about military or foreign affairs matters, or about the actions of the Executive Branch, falls within the outer perimeter of his Office. What makes this case different, they argue, is that President Trump's speech was directed toward the constitutional responsibilities of another Branch of government.

11

The traditional "bully pulpit" of the Presidency, however, is not limited to speech concerning matters for which the President himself bears constitutional or statutory responsibility.  The public looks to the President, as the leader of the Nation, for guidance and reassurance even on matters over which the Executive Branch—or the federal government as a whole—has no direct control.  From the actions of Congress and the Judiciary, to the policies of state and local governments, to the conduct of private corporations and individuals, the President can and must engage with the public on matters of public concern.  Such speech is an important traditional function of the Presidency, and it would offend the constitutional separation-of-powers principles recognized in *Nixon* for courts to superintend the President's speech to his constituents and to other officeholders by entertaining civil damages suits arising out of that speech merely because it concerns the conduct of a coordinate Branch or an entity outside the federal government.  *Cf. Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 665 (D.C. Cir. 2006) (recognizing that a "primary obligation" of a high-ranking elected official "in a representative democracy is to serve and respond to his or her constituents" (quotation omitted)).

*Second*, the district court correctly rejected plaintiffs' contention that any conduct occurring in the context of a political campaign necessarily falls

12

beyond the outer limits of the President's Office.  JA 235-36; *cf.* Plaintiffs Br.

33.  The United States agrees with the district court that "[t]he Office of the

President has no preference for who occupies it" and that "Article II . . . is

agnostic as to whether a sitting President is elected to a new term."  JA 238.  A

President's private, partisan electioneering activities, lacking any significant

nexus to his responsibilities as President, may therefore fall beyond the outer

limits of his Office under *Nixon*.

　　That principle, however, must be understood and applied with the

greatest sensitivity to the complex and unremitting nature of the President's

Office and role, which are not amenable to neat dichotomies.  The Supreme

Court has emphasized, for example, that "there is not always a clear line"

between the President's "personal and official affairs."  *Mazars*, 140 S. Ct. at

2034; *see, e.g.*, *In re Lindsey*, 158 F.3d 1263, 1286 (D.C. Cir. 1998) (per curiam)

(Tatel, J., concurring in part and dissenting in part) (describing the line as

"both elusive and difficult to discern").  That is especially so with respect to the

President's speech to the public.  As the district court observed, a "first-term

President is, in a sense, always a candidate for office," and it is "not the least

bit unusual for first-term Presidents to comment on public policy or foreign

affairs at campaign events, or, in this day, to announce policy changes by tweet

during an election year."  JA 235-36.  The announcement of a Presidential

13

policy decision at a political rally, or remarks on foreign policy delivered at a

campaign event, cannot categorically be excluded from the scope of the

President's Office merely because of the context in which they are made.  And

other statements at such events may be understood by members of the public

and domestic and foreign leaders as reflecting the official views of the

President, not just the remarks of a political candidate.[3]

Nor is it appropriate to frame the immunity question—as even the

district court appeared to do at times—in terms of whether the challenged

conduct of the President was undertaken with a purpose "to secure or

perpetuate incumbency."  JA 238.  The President is both the Chief Executive

and an elected politician; his policy decisions are also political acts with

political consequences.  The Supreme Court in *Nixon* emphatically rejected an

argument that otherwise-official acts lose immunity if they are motivated by an

impermissible purpose.  457 U.S. at 756.  That logic applies with even greater

force to the suggestion that the President should be subject to suit for his

---

[3] For those reasons, and because of differences in the applicable legal
standards, the outer perimeter of the President's Office differs from the scope
of a Member of Congress's employment for purposes of the Westfall Act, 28
U.S.C. § 2679.  *Cf.* U.S. Resp. to Mo Brooks's Westfall Act Pet. at 8-19,
*Swalwell v. Trump*, No. 21-cv-586 (July 27, 2021), Dkt. No. 33 (explaining that
Representative Brooks's speech at the January 6 rally was outside the scope of
his employment because House ethics rules and agency-law principles establish
that campaign activity is not within a Representative's employment).

14

official acts whenever those acts are—or are plausibly alleged to have been—

motivated by electoral or political considerations.[4]

## IV.   Incitement of Imminent Private Violence Is Not Within the Outer Perimeter of the President's Office

The district court also correctly rejected President Trump's categorical

assertion "that whenever and wherever a President speaks on a matter of

public concern he is immune from civil suit," JA 234—even if that speech also

constitutes incitement to imminent private violence.  Speaking to the public on

matters of public concern is a traditional function of the Presidency, and the

outer perimeter of the President's Office includes a vast realm of such speech.

But that traditional function is one of public communication.  It does not

include incitement of imminent private violence of the sort the district court

found that plaintiffs' complaints have plausibly alleged here.

The United States here expresses no view on the district court's

conclusion that plaintiffs have plausibly alleged that President Trump's

January 6 speech incited the subsequent attack on the Capitol.  But because

actual incitement would be unprotected by absolute immunity even if it came

---

[4] The district court correctly dismissed the claim alleging that President Trump improperly failed to exercise his official powers to stop the January 6 attack.  JA 241-42.  *Nixon* forecloses such a claim because it is premised on an allegation that the President had an improper motive for declining to take official action.  *See* 457 U.S at 750, 756.

in the context of a speech on matters of public concern, this Court should reject the categorical argument President Trump pressed below and renews on appeal. Resolving the appeal on that narrow basis would allow the Court to avoid comprehensively defining the scope of the President's immunity for speech to the public—including when and how to draw a line between a President's speech in his presidential capacity and speech in his capacity as a candidate for office.

1. No part of a President's official responsibilities includes the incitement of imminent private violence. By definition, such conduct plainly falls outside the President's constitutional and statutory duties. *Cf. Nixon*, 457 U.S. at 749-50. It likewise falls outside any plausible understanding of the President's traditional function of speaking to the public on matters of public concern. As the Nation's leader and head of state, the President has "an extraordinary power to speak to his fellow citizens and on their behalf." *Hawaii*, 138 S. Ct. at 2417-18. But that traditional function is one of public communication and persuasion, not incitement of imminent private violence. To extend immunity to such incitement would contradict the "constitutional heritage and structure," *Nixon*, 457 U.S. at 748, that have informed and justified the doctrine of presidential immunity.

16

In excluding such incitement from the scope of immunity, however, courts must take care not to adopt rules that would unduly chill legitimate presidential communication or threaten to saddle the President with suits that would be burdensome and intrusive even if they ultimately proved meritless. In exercising their traditional communicative functions, Presidents routinely address controversial issues that are the subject of passionate feelings. Presidents may at times use strong rhetoric.  And some who hear that rhetoric may overreact, or even respond with violence.  Precisely because the President is "an easily identifiable target," *Nixon*, 457 U.S. at 753, the limits on his immunity must be carefully drawn to avoid chilling legitimate presidential speech to the public.  As the district court recognized, "[a] President could not function effectively if there were a risk that routine speech might hale him into court."  JA 282.

In the government's view, therefore, the scope of a President's absolute immunity in this context should be informed by principles analogous to those the Supreme Court has developed in defining the sort of incitement that is unprotected by the First Amendment.  Under *Brandenburg v. Ohio*, 395 U.S. 444 (1969), speech lies outside the First Amendment only if it is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  *Id.* at 447.  That standard reflects our "profound national

17

commitment" that "debate on public issues should be uninhibited, robust, and wide-open." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 928 (1982) (quotation omitted). And it ensures that speakers cannot be held liable merely for "emotionally charged rhetoric," "strong language," or "spontaneous and emotional appeals." *Id.*; *see, e.g.*, *Hess v. Indiana*, 414 U.S. 105, 108-09 (1973).

Just as the Nation has a profound interest in ensuring that public debate in general is "robust" and "uninhibited," *Claiborne*, 458 U.S. at 928 (quotation omitted), it has a special interest in ensuring that the threat of lawsuits does not render the President "unduly cautious" when he speaks for and to the public, *Nixon*, 457 U.S. at 752 n.32. The President should thus be afforded broad latitude to make "spontaneous and emotional appeals" without fear that such "extemporaneous" remarks will give rise to litigation and potential liability. *Claiborne*, 458 U.S. at 928. But just as denying First Amendment protection to incitement does not unduly chill speech in general, denying absolute immunity to incitement of imminent private violence should not unduly chill the President in the performance of his traditional function of speaking to the public on matters of public concern—provided that courts apply the relevant principles rigorously and with appropriate sensitivity and deference to the President's unique role and the varying circumstances in which he is called upon to speak for and to the public.

In particular, a court considering a claim seeking to hold a President liable for violence allegedly connected with his speech should deny absolute immunity only if the speech, viewed objectively and in context, both encouraged imminent private violence and was likely to produce such violence. Rigorous application of those objective inquiries avoids the concerns that would arise if immunity turned on "an inquiry into the President's motives." *Nixon*, 457 U.S. at 756.

Of course, even if incitement principles did not inform the scope of absolute immunity, a President whose speech was deemed outside the protections of his absolute immunity for other reasons could still invoke *Brandenburg* as a First Amendment defense on the merits—as President Trump did here. *See* JA 286-99. But incorporating similar principles into the immunity analysis has an important benefit: Because presidential immunity is an immunity not just from liability but also from the burdens of litigation, an order denying immunity is immediately appealable under the collateral-order doctrine. *See Nixon*, 457 U.S. at 741-43. Such immediate appellate review provides an important safeguard against the risk of unfounded suits that could threaten to chill presidential speech or "distract a President from his public duties." *Id.* at 753.

19

2.  Although the district court did not analyze the absolute-immunity question through the lens of the incitement principles discussed above, the court applied similar principles in rejecting President Trump's First Amendment defense.  Specifically, the court held that plaintiffs' complaints plausibly allege that the former President's January 6 speech constituted "an implicit call for imminent violence or lawlessness" that satisfied the "stringent" requirements of *Brandenburg*.  JA 297-98.  Plaintiffs, for their part, have not framed their immunity arguments in *Brandenburg* terms, but their central contention in this Court is that the former President's speech instigated the "attack on Congress."  Br. 19; *see id.* at 22 ("For purposes of this appeal," the allegation that the former President "urged, aided, and abetted" the attack "must be taken as true."); *see also id.* at 2-3, 20, 25, 42-43 & n.11, 46-49.

President Trump's briefs do not directly challenge plaintiffs' characterization of his speech for purposes of this appeal.  Instead, the former President has advanced a single, categorical argument:  that "speech on matters of public concern falls within the scope of a president's official functions," regardless of the circumstances.  Trump Br. 7; *see, e.g.*, Reply Br. 2 ("The underlying question here is simple: is a president immune from civil liability when he or she gives a speech on a matter of public concern?  The answer is undoubtedly, yes.").  And at oral argument, the former President's

20

counsel reiterated his view that absolute immunity extends even to speech that incites imminent private violence.  *See, e.g.*, Oral Arg. 20:15-23:05.

Given the way the parties have framed their arguments in this Court, the United States respectfully submits that the Court could resolve this appeal by rejecting the former President's categorical position and holding that a President's speech on a matter of public concern is not protected by absolute immunity if it constitutes incitement to imminent private violence—as the parties have effectively assumed was true here for purposes of this appeal. Such a narrow decision would leave for further proceedings in the district court (and, if necessary, a future appeal) any renewed assertion of absolute immunity more narrowly focused on whether the former President's speech actually constituted incitement.

3.  Such a narrow decision would allow the Court to avoid deciding other questions about the scope of presidential immunity, including when and how courts should attempt to separate the President's official and campaign roles.  In principle, as discussed, those roles are undoubtedly separate:  "The Office of the President has no preference for who occupies it," JA 238, and the Executive Branch has recognized that partisan electioneering activities are not among the President's official functions, *see, e.g.*, *Payment of Expenses Associated with Travel by the President and Vice President*, 6 OLC Op. 214, 216 (1982).  A

President thus does not act within the outer perimeter of his office when he takes a variety of actions connected with his reelection campaign, such as hiring and directing his campaign staff.

There may also be circumstances in which a President acts purely in his private capacity as a candidate for office even though he is speaking to the public about matters of public concern. But as explained above, drawing a principled and judicially administrable line between the President's official and electoral speech would pose sensitive and difficult questions. The United States respectfully submits that this unusual case would be a poor vehicle for attempting to answer those questions. Every President engages in a wide array of speech that could be characterized as electoral, so the contours of immunity in this context are of great importance to the presidency and to future Presidents. In the government's view, any decision about how to define the limits of absolute immunity in campaign contexts should await a case in which the relevant issues have been fully briefed and it is necessary to decide them.

22

## CONCLUSION

The district court's denial of absolute immunity should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

MARK R. FREEMAN
MARK B. STERN
JOSHUA M. SALZMAN

*/s/ Sean R. Janda*
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

23

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit established in this Court's order of December 20, 2022 because it contains 5,016 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Calisto MT 14-point font, a proportionally spaced typeface.

*/s/ Sean R. Janda*

Sean R. Janda